43 F.3d 1442
 16 ITRD 2185
 LASKO METAL PRODUCTS, INC., Plaintiff-Appellant,
v.
The UNITED STATES, Durable Electrical Metal Factory, Ltd.,
Paragon Industries, Holmes Products Corporation and Esteem
Industries, Ltd., WUXI Fan Factory, Shell Electric Mfg.
(China) Co., Ltd., SMC Electric Mfg. Co., and SMC Marketing
Corporation,
and
Wing Tat Electric Mfg. Co., Ltd., Wing Tat Electric Mfg.
(Int'l) Co., Ltd. and China Miles Corporation,
Polaray Industrial and Paragon
Industries, Inc., Defendants-Appellees.
 No. 93-1242.
 United States Court of Appeals,
Federal Circuit.
 Dec. 29, 1994.
 
 Lawrence J. Bogard, McKenna & Cuneo, Washington, DC, argued for plaintiff-appellant. With him on the brief was Peter Buck Feller.
 Jeffrey M. Telep, Atty., Commercial Litigation Branch, Dept. of Justice, Washington, DC, argued for defendant-appellee, the U.S. With him on the brief were Stuart E. Schiffer, Acting Asst. Atty. Gen. and David M. Cohen, Director; Alicia D. Greenidge, U.S. Dept. of Commerce. Also on the brief were Stephen J. Powell, Chief Counsel for Import Admin. and Berniece A. Browne, Attorney-Advisor, Office of the Chief Counsel for Import Admin., U.S. Dept. of Commerce, of counsel.
 Arthur J. LaFave, III, Dickstein, Shapiro & Morin, Washington, DC, argued for defendants-appellees, Durable Elec. Metal Factory, Ltd., Paragon Industries, Holmes Products Corp. and Esteem Industries, Ltd. With him on the brief was Douglas N. Jacobson.
 John H. Korns, Pettit & Martin, of Washington, DC, for defendants-appellees, Shell Elec. Mfg. (China) Co., Ltd., SMC Elec. Mfg. Co., and SMC Marketing Corp.
 James Taylor, Jr., Stroock & Stroock & Lavan, Washington, DC, for defendants-appellees, Wing Tat Elec. Mfg. Co., Ltd., Wing Tat Elec. Mfg. (Int'l) Co., Ltd., China Miles Corp. and Polaray Industrial Corp.; Panagiotis C. Bayz and Matthew H. McCarthy, of counsel.
 William J. Clinton, Wilkie, Farr & Gallagher, Washington, DC, for WUXI Fan Factory.
 Before MICHEL, Circuit Judge, SMITH, Senior Circuit Judge, and PLAGER, Circuit Judge.
 PLAGER, Circuit Judge.
 
 
 1
 This is a dumping case. The appeal in this case challenges the way in which the Department of Commerce (Commerce) calculates the foreign market value (FMV) in making its determination of a dumping margin when dealing with a nonmarket economy country (NME). The question posed is whether the governing statute requires Commerce to ignore the best evidence on costs that is available to it--costs actually paid by the manufacturer in the NME--and instead use only surrogate numbers when it employs a "factors of production" calculation. Appellant Lasko Metal Products (Lasko) argues that Congress, whether it meant to or not, has required exactly that. The Government and the industry members who would be adversely affected argue that there are more than enough words in the statute to permit Commerce to employ the methodology it uses, either because the statute specifically grants Commerce that flexibility or because the statute is silent on the point and Commerce's reading is a permissible one.
 
 
 2
 The statute that Congress has written establishing the policy and procedures governing antidumping and countervailing duties is a detailed and complex one. As we shall explain, we cannot find in the statute any precise prohibition on the use of Commerce's methodology, and there is much in the statute that supports the notion that it is Commerce's duty to determine margins as accurately as possible, and to use the best information available to it in doing so. Accordingly, we affirm the judgment of the Court of International Trade in Lasko Metal Products v. United States, 810 F.Supp. 314 (Ct.Int'l Trade 1992), upholding a determination by the Department of Commerce, International Trade Administration (ITA), of the fair value of certain fans imported from China.
 
 BACKGROUND
 
 3
 Lasko is a United States manufacturer of ceiling and oscillating fans. On October 31, 1990, Lasko petitioned the ITA and the United States International Trade Commission (ITC), alleging that certain Chinese manufacturers of electric ceiling and oscillating fans were dumping their merchandise on the United States market, and that the domestic industry was thereby materially injured. In response to Lasko's petition, the ITC on December 27, 1990, issued a preliminary affirmative injury determination. Certain Electric Fans From the People's Republic of China, 55 Fed.Reg. 53,203 (USITC 1990).
 
 
 4
 The ITA for its part undertook an investigation to determine if there were sales at less than fair value. Oscillating Fans and Ceiling Fans from the People's Republic of China, 55 Fed.Reg. 49,320 (Dep't Comm.1990). The ITA sent a questionnaire to numerous Chinese manufacturers. After receiving the responses the ITA issued a preliminary determination of sales at less than fair value. Oscillating Fans and Ceiling Fans From the People's Republic of China, 56 Fed.Reg. 25,664 (Dep't Comm.1991). In its preliminary determination, the ITA concluded that China was a NME.[1] The ITA therefore calculated pursuant to statute FMV for ceiling and oscillating fans manufactured in China by estimating the value of the factors of production. Because the actual costs of certain factors of production in China were not known, the ITA used the cost of elements of production in a surrogate country (Pakistan), in addition to certain known costs of production, which were the prices the Chinese manufacturers paid for manufacturing supplies on the international market.
 
 
 5
 After the initial determination, responses were verified, briefs were submitted, hearings were held, and comment was received. Effective October 22, 1991, the ITA entered a final determination that Chinese fans were being sold in the United States at slightly less than fair value. Oscillating Fans and Ceiling Fans From the People's Republic of China, 56 Fed.Reg. 55,271 (Dep't Comm.1991). Since the fans were sold at only slightly less than fair value, the ITA preliminarily found correspondingly low antidumping duty margins.
 
 
 6
 On December 2, 1991, the ITC notified the ITA of its final determination that the dumping of fans materially injured United States industry. Certain Electric Fans From the People's Republic of China, 56 Fed.Reg. 64,642 (USITC 1991). The ITA then issued, effective December 9, 1991, Antidumping Duty Orders and Amendments to Final Determinations of Sales at Less than Fair Value: Oscillating Fans and Ceiling Fans From the People's Republic of China, 56 Fed.Reg. 64,240 (Dep't Comm.1991).
 
 
 7
 Thereafter Lasko sued in the Court of International Trade both the ITA and the Chinese manufacturers, claiming that the combination of surrogate costs and actual costs used by the ITA to calculate FMV was illegal under the express terms of the Act,[2] and that, as a result, the antidumping duties imposed on the fans from China were too low. The ITA responded that its methodology was well within the discretion granted to it by the Act. The Court of International Trade decided in favor of the ITA and the Chinese manufacturers. Lasko Metal Products, 810 F.Supp. 314. Lasko appeals that decision to this court.
 
 DISCUSSION
 
 8
 Lasko contends that the Act explicitly sets forth a hierarchy of methodologies through which FMV is to be determined. If the ITA cannot calculate FMV using the primary method, the ITA must resort to the secondary one, and if that is unworkable, recourse is had to the third, and so forth. Lasko contends that the plain language of the Act requires strict segregation of the methodologies for determining FMV.
 
 
 9
 Appellees are of the view that the Act does not speak to the question presented by this case, and therefore it vests considerable discretion in the ITA. Appellees urge deference to the ITA's determination under Chevron U.S.A. v. Natural Resources Defense Council, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), which stated that "if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based upon a permissible construction of the statute." Id. at 843, 104 S.Ct. at 2782 (footnote omitted).
 
 
 10
 Lasko's answer to appellees is that Chevron specifically excludes this case from the rule urged by them:
 
 
 11
 When a court reviews an agency's construction of the statute which it administers, it is confronted with two questions. First, always, is the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress.
 
 
 12
 Id. at 842-43, 104 S.Ct. at 2781-82 (footnote omitted). Lasko argues that the statute speaks directly to the question, and the intent of Congress is unmistakable.
 
 
 13
 The answer to the question posed lies then in the language of the Act. In general, the Act provides that the FMV of imported merchandise is the price at which it is sold in the principal markets of the country from which it is exported (the home market), or if there is no home market, the price at which it is sold to countries other than the United States (third party markets). 19 U.S.C. Sec. 1677b(a)(1) (1988). Under certain circumstances a third method for determining FMV, called "constructed value," may be employed. 19 U.S.C. Sec. 1677b(a)(2) (1988).
 
 
 14
 However, if the merchandise under investigation is exported from a NME, a special provision, 19 U.S.C. Sec. 1677b(c) (1988), applies; that provision applies here since the determination that China is a NME is not challenged. Section 1677b(c) states:
 
 
 15
 (c) Nonmarket economy countries.
 
 
 16
 (1) In general
 
 
 17
 If--
 
 
 18
 (A) the merchandise under investigation is exported from a nonmarket economy country, and
 
 
 19
 (B) the administering authority finds that available information does not permit the foreign market value of the merchandise to be determined under subsection (a) of this section,
 
 
 20
 the administering authority shall determine the foreign market value of the merchandise on the basis of the value of the factors of production utilized in producing the merchandise and to which shall be added an amount for general expenses and profit plus the cost of containers, coverings, and other expenses, as required by subsection (e) of this section. Except as provided in paragraph (2), the valuation of the factors of production shall be based on the best available information regarding the values of such factors in a market economy country or countries considered to be appropriate by the administering authority. (Emphasis supplied.)
 
 
 21
 Simply put, if the ITA cannot determine FMV pursuant to the general provisions of Sec. 1677b(a), then the ITA must use the factors of production methodology to estimate FMV for the merchandise in question. Paragraph 4 of Sec. 1677b(c) further provides that the ITA "shall utilize, to the extent possible, the prices or costs of factors of production in one or more market economy countries that are at a level of economic development comparable to that of the nonmarket economy country, and significant producers of comparable merchandise."
 
 
 22
 The ITA found that available information did not permit FMV to be determined under subsection (a). Pursuant to Sec. 1677b(c)(1), then, the ITA applied the challenged version of the factors of production methodology to determine FMV. The ITA figured certain factors of production, for example the cost of factory overhead, on the basis of the factor's cost in a surrogate country, Pakistan. As noted, Sec. 1677b(c)(4) specifically authorizes the ITA to use surrogate countries to estimate the value of the factors of production.
 
 
 23
 But with regard to other factors of production, for example supplies required for the manufacture of the fans, the ITA took the cost to be the amount the Chinese manufacturers actually paid on the international market for the supplies they used. The issue presented by this case is whether or not the Act permits the ITA to determine the factors of production using both surrogate country values and actual cost values.
 
 
 24
 Lasko argues that the Act expressly prohibits mixing methodologies for calculating FMV. Lasko insists that the text of p (c)(1) emphasized above requires that if FMV cannot be calculated according to one of the "normal" methods set forth in Sec. 1677b(a), i.e., on the basis of home market sales prices, third country sales prices, or constructed value, then FMV must be calculated on the basis of surrogate values obtained from a market economy. According to Lasko, the text of the Act is clear: Congress has required ITA to determine FMV in a NME solely on the basis of surrogate factors of production.
 
 
 25
 On the contrary, p (c)(1) provides that in determining FMV in a NME, the ITA shall take into account the various factors set out in Sec. 1677b(e). Subsection (e) relates to the determination of constructed value of imported merchandise for purposes of Sec. 1677b(a), and includes factors such as the cost of materials and labor, p (e)(1)(A); general expenses and profit, p (e)(1)(B); and shipping preparation, p (e)(1)(C). The Act simply does not say--anywhere--that the factors of production must be ascertained in a single fashion. The Act requires the ITA determination to be based on the "best available information regarding the values of such factors in a market economy country or countries considered to be appropriate by the administering authority." 19 U.S.C. Sec. 1677b(c)(1). In this case, the best available information on what the supplies used by the Chinese manufacturers would cost in a market economy country was the price charged for those supplies on the international market. See Allied-Signal Aerospace Co. v. United States, 996 F.2d 1185, 1191 (Fed.Cir.1993) (statutory purpose "is to facilitate the determination of dumping margins as accurately as possible ...").
 
 
 26
 As the Court of International Trade correctly observed, although Lasko's "alternative interpretation of the statute requiring that ITA abandon all actual prices once it is forced to resort to surrogate country values might have been possible, ... such an interpretation would conflict with the overall statutory purpose." Lasko Metal Products, 810 F.Supp. at 317-18. The purpose of the Act is to prevent dumping, an activity defined in terms of the marketplace. The Act sets forth procedures in an effort to determine margins "as accurately as possible." Rhone Poulenc, Inc. v. United States, 899 F.2d 1185, 1191 (Fed.Cir.1990). "Where we can determine that a NME producer's input prices are market determined, accuracy, fairness, and predictability are enhanced by using those prices. Therefore, using surrogate values when market-based values are available would, in fact, be contrary to the intent of the law." Oscillating Fans and Ceiling Fans from the People's Republic of China, 56 Fed.Reg. 55271, 55275 (Dep't Comm.1991) (final determination).
 
 
 27
 In situations in which a statute does not compel a single understanding, the Supreme Court and this court have held that "our duty is not to weigh the wisdom of, or to resolve any struggle between, competing views of the public interest, but rather to respect legitimate policy choices made by the agency in interpreting and applying the statute." Suramerica de Aleaciones Laminadas, C.A. v. United States, 966 F.2d 660, 665 (Fed.Cir.1992).[3] The Court of International Trade held that the ITA's methodology for determining the FMV of the fans from China was reasonable and consistent with the agency's statutory authority. We see no error in this determination.
 
 
 28
 AFFIRMED.
 
 
 
 [1]
 It is unquestioned that, whatever changes may have occurred over the last few years, China is not a market economy. Oscillating Fans and Ceiling Fans From the People's Republic of China, 56 Fed.Reg. 25,664, 25,667 (Dep't Comm.1991) (detailing ITA findings of Chinese producers' costs that were not market-based)
 
 
 [2]
 Section 773 of the Tariff Act of 1930, as amended by, inter alia, the Omnibus Trade and Competitiveness Act of 1988, Pub.L. No. 100-418, Sec. 1316(a), 102 Stat. 1186, 1189 (1988), codified as amended at 19 U.S.C. Sec. 1677b(c) (1988)
 
 
 [3]
 Suramerica relied on the Supreme Court's Chevron analysis. In Suramerica, the issue was whether the agency's official interpretation of its organic legislation was a permissible reading of the statute. The policy underlying the Supreme Court's grant in Chevron of special deference to agency regulations and similar official agency pronouncements does not extend to every agency action--it would not, for example, extend to ad hoc representations on behalf of the agency, such as litigation arguments. In this case the issue is much like that in Suramerica--an officially mandated agency methodology considered by the agency to be within its statutorily granted discretion