## WRITING INSTRUMENT MANUFACTURERS ASSOCIATION, PENCIL SECTION, et al., Plaintiffs,

v.

## The UNITED STATES DEPARTMENT OF COMMERCE, Defendant,

and

## China First Pencil Company, Inc., et al., Defendant–Intervenors.

Slip Op. 97–151.
Court No. 95–01–00081.

United States Court of International Trade.

Nov. 13, 1997.

Neville, Peterson & Williams (John M. Peterson, George W. Thompson and Peter J. Allen), Washington, DC, for Plaintiffs.

Frank W. Hunger, Assistant Attorney General, David M. Cohen, Director, Commercial Litigation Branch, Civil Division, U.S. Department of Justice (Velta A. Melnbrencis, of counsel), Barbara Campbell–Potter, Office of the Chief Counsel for Import Administration, U.S. Department of Commerce, Washington, DC, for Defendant.

Dickstein, Shapiro & Morin, L.L.P. (Francis J. Sailer and Sarah M. Efthymiou), Washington, DC, for Defendant-Intervenors.

## OPINION

MUSGRAVE, Judge.

Plaintiffs brought this action to contest the Remand Determination of the *Notice of Final Determination of Sales at Less Than Fair Value: Certain Cased Pencils From the People's Republic of China*, 59 Fed.Reg. 55,625 (1994) ("Final Determination"). Plaintiffs contest the Remand Determination with respect to eight issues: (1) Commerce's use of U.S. basswood prices as a surrogate; (2) Commerce's use of Pakistani surrogate values for lacquer, ferrules and erasers; (3) Commerce's failure to use import tariffs in its calculation of foreign market value; (4) Commerce's failure to use actual transportation and general, selling and administrative costs; (5) Commerce's granting separate rates to the four exporters; (6) Commerce's wood slat surrogate valuation; (7) Commerce's log surrogate valuation; and (8) Commerce's calculation of the "all others" rate. Defendant-intervenors contest the Remand Determination's wood slat surrogate valuation. The Court affirms the Remand Determination in all respects for the reasons that follow.

### *Background*

On November 10, 1993, plaintiffs, the Pencil Section of the Writing Instrument Manufacturers Association ("WIMA") composed of Dixon–Ticonderoga Corp., Empire Berol Corp., Faber–Castell Corp., General Pencil Company, J.R. Moon Pencil Company and Musgrave Pen & Pencil Co., filed an antidumping petition with the United States Department of Commerce ("Commerce") and the United States International Trade Commission ("ITC") alleging that pencils from the People's Republic of China ("PRC") were being sold at prices below fair market value to the detriment of the domestic pencil industry. On December 8, 1993, Commerce initiated an antidumping investigation on cased pencils from the PRC covering the period of investigation ("POI") from June 1, 1993 through November 30, 1993. *Initiation of Antidumping Duty Investigations: Certain Cased Pencils From the People's Republic of China and Thailand*, 58 Fed.Reg. 64,548 (1993). On December 20, 1993, the ITC determined that there was a reasonable indication that cased pencils from the PRC were causing material injury to the domestic industry. *Certain Cased Pencils From the People's Republic of China and Thailand*, 59 Fed.Reg. 593 (1994).

Three Chinese pencil manufacturers filed appearances as parties to the Commerce proceeding: China First Pencil Co. ("China First"), Shanghai Three Star Stationery In-

dustry Corporation ("Three Star") and Anhui Stationery Company ("Anhui"). Four Chinese pencil exporters were also parties to the Commerce proceeding: China First, Shanghai Foreign Trade Corporation ("SFTC"), Shanghai Langsheng Corporation ("Langsheng"), and Guangdong Provincial Stationery & Sporting Goods Import & Export Corporation ("Guangdong"). On June 8, 1994, Commerce made a preliminary determination that pencils from the PRC were sold at less than fair value ("LTFV"). *Notice of Preliminary Determination of Sales at Less Than Fair Value: Certain Cased Pencils from the People's Republic of China*, 59 Fed.Reg. 30,911 (1994). In the preliminary determination, Commerce found the following separate weighted-average dumping margins for pencil exporters from the PRC: Guangdong—58.34%, SFTC—100.98%, Langsheng—100.98% and all others/country-wide—107.63%. *Id.*

From July 4 through 15, 1994, Commerce conducted a verification of the responses of the manufacturers and exporters and interested parties were given the opportunity to submit written comments concerning the investigation. A public hearing was held on October 5, 1994. Commerce issued its Final Determination finding the following separate weighted-average dumping margins for the four participating exporters that requested separate rates:

 (1) China First, purchases from manufacturer "Company A"—0%;

 (2) China First, purchases from any other manufacturer—44.66%;

 (3) Guangdong, purchases from manufacturer "Company B"—0%;

 (4) Guangdong, purchases from any other manufacturer—44.66%;

 (5) SFTC—8.31%; and

 (6) Lansheng—17.45%.

*Notice of Final Determination of Sales at Less Than Fair Value: Certain Cased Pencils from the People's Republic of China*, 59 Fed.Reg. 55,625, 55,631 (1994). Commerce assigned the countrywide/all others rate of 44.66% to non-participating respondents. *Id.*

On December 15, 1994, the ITC reached a final affirmative determination that cased pencils from the PRC were threatening the domestic industry with material injury. *Certain Cased Pencils From the People's Republic of China*, 59 Fed.Reg. 65,788 (1994). Commerce subsequently issued an antidumping duty order on cased pencils from the PRC where Company A was identified as China First and Company B was identified as Three Star. *Antidumping Duty Order: Certain Cased Pencils From the People's Republic of China*, 59 Fed.Reg. 66,909 (1994).

Plaintiffs filed a summons and complaint on January 25, 1995 alleging, *inter alia*, that Commerce failed to provide the plaintiffs adequate opportunity to supply pricing information on United States basswood, which Commerce adopted as the surrogate wood in valuing the PRC lindenwood used in the actual production of the pencils at issue. Plaintiffs also attacked Commerce's use of the United States as a surrogate market economy. During the investigation, Commerce determined that the PRC was a non-market economy ("NME") country and chose India as the preferred surrogate country but also used surrogate data from Pakistan, Indonesia and the United States. Finally, plaintiffs argued that Commerce employed incorrect methodology in valuing basswood slats and logs.

Based on a motion from Commerce, the Court remanded the case in order to (1) reopen the administrative record for submission of publicly available published information ("PAPI") by plaintiffs and any other corroborating information regarding U.S. basswood prices by defendant-intervenors and (2) reopen the administrative record for submission of PAPI and corroborating information regarding the appropriate methodology for valuing basswood slats and logs.

Commerce issued its Remand Determination on March 22, 1996. Commerce decided to rely on PAPI regarding U.S. basswood pricing utilized in the Final Determination rather than the private studies submitted by plaintiffs in an effort to "increase predictability and certainty." Def.'s Br. at 19. Commerce also found that it was appropriate to change the methodology used to value logs

and slats which resulted in recalculation of the average-weighted dumping margins. Both the plaintiffs and defendant-intervenors disputed the Remand Determination results and the Court now determines whether the Remand Determination is supported by substantial evidence and in accordance with law.

## Standard of Review

■ In reviewing a final antidumping determination, the Court "shall hold unlawful any determination, finding, or conclusion found ... to be unsupported by substantial evidence on the record, or otherwise not in accordance with law, ..." 19 U.S.C. § 1516a(b)(1)(B) (1994). Under this standard, the Court first reviews the agency's methodology to ensure that it is a reasonable means of administering the antidumping statute. The Court will "evaluate for reasonableness the way in which Commerce chose to interpret" the statute it is applying. *Micron Technology, Inc. v. United States*, 117 F.3d 1386, 1396 (1997). Where the statute is clear, the Court "must give effect to the unambiguously expressed intent of Congress." *Chevron U.S.A. Inc. v. Natural Resources Defense Council*, Inc., 467 U.S. 837, 843, 104 S.Ct. 2778, 2781, 81 L.Ed.2d 694 (1984). Where the statute is unsettled, the Court reviews "whether the agency's answer is based on a permissible construction of the statute." *Id.*

■ The Court then reviews whether the agency's determinations are supported by substantial evidence on the record. "As long as the agency's methodology and procedures are reasonable means of effectuating the statutory purpose, and there is substantial evidence in the record supporting the agency's conclusions, the court will not impose its own views as to the sufficiency of the agency's investigation or question the agency's methodology." *Ceramica Regiomontana, S.A. v. United States*, 10 CIT 399, 404–5, 636 F.Supp. 961, 966 (1986), *aff'd* 5 Fed. Cir. (T) 77, 810 F.2d 1137 (1987) (citations omitted). Substantial evidence "means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477, 71 S.Ct. 456, 458, 95 L.Ed. 456 (1951)

(citation omitted). "[Substantial evidence] is something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." *Consolo v. Federal Maritime Comm'n*, 383 U.S. 607, 620, 86 S.Ct. 1018, 1026, 16 L.Ed.2d 131 (1966) (citations omitted).

## Discussion

Commerce is directed to apply the antidumping provisions contained in the statute in order to determine the dumping margins in its investigation. The United States antidumping provision compares a product's home market sales price to the product's United States sales price. When the home market price, also known as the foreign market value, exceeds the selling price in the U.S., the difference is calculated and imposed as a duty on the imported merchandise. The United States Code antidumping provision is straightforward:

**19 U.S.C. § 1673. Imposition of antidumping duties**

If –

(1) the administering authority determines that a class or kind of foreign merchandise is being, or is likely to be, sold in the United States at less than its fair value, and

(2) the Commission determines that –

(A) an industry in the United States –

(i) is materially injured, or

(ii) is threatened with material injury, or

(B) the establishment of an industry in the United States is materially retarded,

by reason of imports of that merchandise or by reason of sales (or the likelihood of sales) of that merchandise for importation,

then there shall be imposed upon such merchandise an antidumping duty, in addition to any other duty imposed, in an amount equal to the amount by which the

foreign market value exceeds the United States price for the merchandise.

19 U.S.C. § 1673 (1988). In other words, when: (1) Commerce determines that merchandise is being sold or about to be sold in the U.S. at a price less than what the merchandise sells for in its home market (less than fair value ("LTFV")); and (2) the ITC determines that the U.S. domestic industry producing the same merchandise is suffering or likely to suffer direct harm from the importation of the foreign merchandise; then (3) Commerce shall impose a duty on that foreign merchandise equal to the difference between its U.S. selling price ("USP") and its foreign market value ("FMV"). The duty imposed by Commerce, called the "antidumping duty" or "dumping margin," thereby corrects for the dumping effects in the U.S. market by raising the U.S. selling price to the same price as the merchandise sells in its home market.

While the antidumping statute is straightforward, its interpretation and administration have been anything but absolute. In the instant case, Commerce made a determination that cased pencils from the PRC were being sold in the U.S. for less than fair value and the ITC found that these sales at LTFV threatened the domestic industry with material injury. Due to Commerce's finding that the PRC is a NME country, Commerce had to calculate the foreign market value of the cased pencils using constructed value and factors of production based on prices from surrogate countries. Commerce found that India and Pakistan were the preferred surrogate countries for surrogate prices but Commerce also used prices from Indonesia and the U.S. It is Commerce's use of these surrogate prices and the methodology that Commerce employed in calculating the surrogate prices that plaintiffs and defendant-intervenors bring before the Court for review. The Court finds that Commerce's determination in its Remand Determination is supported by substantial evidence and in accordance with law for the reasons that follow.

## I. Surrogate Pricing Methodology

### A. Due Process Claim

■ As a threshold matter, plaintiffs contend that the tardiness of Commerce's request for U.S. basswood pricing as a surrogate for the PRC lindenwood used in the production of the subject merchandise violated plaintiffs' due process rights and "constituted prejudicial error." Plts.' Reply Br. at 32. The Court recognized the importance of the pricing of wood in constructing the FMV of cased pencils and remanded this precise issue to ensure that Commerce had information submitted from all interested parties. Therefore, the Court finds that all parties had ample opportunity to present information on surrogate wood pricing. Even though plaintiffs petitioned the Court to remand the issue to Commerce in order to obtain U.S. basswood prices, they now contend that remanding the issue does not cure the harm plaintiffs suffered and, further, that the only remedy available for the tardy submission of the surrogate prices is the exclusion of the information from the record and recalculation of the dumping margins. *Id.* at 37.

■ The Court notes that it is not uncommon for issues that were not considered, or not properly considered, in dumping investigations to be remanded to Commerce for reconsideration. To the extent that plaintiffs challenge the Court's power to remand the issues at hand, 28 U.S.C. § 2106 directs appellate courts to "affirm, modify, vacate, set aside or reverse any judgment, decree, or order of a court lawfully brought before it for review, and may remand the cause and direct the entry of such appropriate judgment, decree, or order, or require such further proceedings to be had as may be just under the circumstances." 28 U.S.C. § 2106 (1994). In addition, 28 U.S.C. § 2347(c) provides:

If a party to a proceeding to review applies to the court of appeals in which the proceeding is pending for leave to adduce additional evidence and shows to the satisfaction of the court that –

(1) the additional evidence is material; and

(2) there were reasonable grounds for failure to adduce the evidence before the agency;

the court may order the additional evidence and any counterevidence the oppo-

site party desires to offer to be taken by the agency. The agency may modify its findings of fact, or make new findings, by reason of the additional evidence so taken, and may modify or set aside its order, and shall file in the court the additional evidence, the modified findings or new findings, and the modified order or the order setting aside the original order.

28 U.S.C. § 2347(c) (1994). Subject to the Court's discretion as an appellate court in this matter, the Court made the determination that the record needed to be reopened to obtain information on U.S. basswood pricing and methodology and remanded the case to Commerce. The Court finds that plaintiffs' due process rights were not violated and further finds that plaintiffs had ample opportunity to submit pertinent information.

## B. The Use of U.S. Basswood Pricing

Subject to the antidumping statute,[1] Commerce determined that the PRC was an NME country and that Commerce would calculate FMV based on factors of production in one or more market economy countries. Commerce ascertained the value of each component, or factor, of pencil production by selecting an appropriate surrogate market economy country to formulate the FMV. Commerce concluded that India was the preferred surrogate market economy country but Commerce also used surrogate prices from other countries in the preliminary and Final Determinations.

In the preliminary determination of FMV, Commerce searched for an appropriate surrogate price for Chinese lindenwood, the most significant factor of production in PRC pencils. The Chinese lindenwood comprised half of the value of pencils; the selected surrogate price would necessarily have a corresponding impact on the resulting FMV.

Chinese lindenwood is a wood that is indigenous only to the PRC and represents a unique factor of production. Commerce encountered significant difficulty in obtaining comparable surrogate values for Chinese lindenwood. In the preliminary determination, Commerce used the Asian market price for a basket category of woods imported into India, which included jelutong wood, as a surrogate for the Chinese lindenwood. Jelutong wood is a similar wood to Chinese lindenwood and is used in pencil production. In the Final Determination, however, Commerce decided to utilize U.S. basswood as the Chinese lindenwood surrogate. Commerce used U.S. basswood based on the opinion of industry experts that basswood is "nearly indistinguishable" from Chinese lindenwood while jelutong is only "quite similar." *Notice of Final Determination of Sales at Less Than Fair Value: Certain Cased Pencils from the People's Republic of China,* 59 Fed. Reg. 55,625, 55,629 (1994). Commerce admits that this information was available at the time of the preliminary determination but a surrogate value for basswood was not available. *Id.*

■ Plaintiffs contend that Commerce's switch from the Indian surrogate price of jelutong to U.S. basswood represents an impermissible application of the FMV and NME statutes. Specifically, plaintiffs argue that the primary objective of the statute is to determine a preferred surrogate market economy country or countries and use the most similar factor of production within that surrogate. Plaintiffs assert that the use of any surrogate prices from the U.S. frustrates the statute since the U.S. market economy is not at a level of economic development comparable to that of the PRC's economy. Plts.' Reply Br. at 10–15. Commerce maintains

1. In determining foreign market value, under 19 U.S.C. § 1677b(c), a nonmarket economy country exists when:

 (A) the merchandise under investigation is exported from a nonmarket economy country, and

 (B) the administering authority finds that available information does not permit the foreign market value of the merchandise to be determined under subsection (a) of this section,

the administering authority shall determine the foreign market value of the merchandise on the basis of the value of the factors of production utilized in producing the merchandise ... the valuation of the factors of production shall be based on the best available information regarding the values of such factors in a market economy country or countries considered to be appropriate by the administering authority.

19 U.S.C. § 1677b(c) (1988).

that the statute "directs Commerce to consider the particular factor of production for which valuation is sought whenever Commerce employs the factors of production methodology." Def.'s Br. at 36. The Court finds that the paramount objective of the statute is to obtain the most accurate determination of dumping margins utilizing the best information available within the broad outlines of the statute. Commerce's use of U.S. basswood is consistent with the primary objective of the statute and is supported by substantial evidence and otherwise in accordance with law.

Under 19 U.S.C. § 1677b(c)(2), Commerce, as the administering authority, is charged with determining the FMV in a NME as follows:

> the administering authority shall determine the foreign market value on the basis of the price at which merchandise that is –
>
> > (A) comparable to the merchandise under investigation, and
> >
> > (B) produced in one or more market economy countries that are at a level of economic development comparable to that of the nonmarket economy country,
>
> is sold in other countries, including the United States.

19 U.S.C. § 1677b(c)(2) (1988). Factors of production are calculated as follows:

> the administering authority shall determine the foreign market value of the merchandise on the basis of the value of the factors of production utilized in producing the merchandise ... the valuation of the factors of production shall be based on the best available information regarding the values of such factors in a market economy country or countries considered to be appropriate by the administering authority.

19 U.S.C. § 1677b(c) (1988). Valuation of the factors of production is ascertained as follows:

> The administering authority, in valuing factors of production ... shall utilize, to the extent possible, the prices or costs of factors of production in one or more market economy countries that are –

> > (A) at a level of economic development comparable to that of the nonmarket economy country, and
> >
> > (B) significant producers of comparable merchandise.

19 U.S.C. § 1677b(c)(4) (1988).

Underlying the various sections of the antidumping statute is the paramount objective of determining the most accurate dumping margins which entails using the best information available ("BIA"). The Court of Appeals for the Federal Circuit ("CAFC") has established that accuracy is the central purpose of the antidumping statute. In *Rhone Poulenc, Inc. v. United States,* 8 Fed. Cir. (T) 61, 899 F.2d 1185 (1990), the CAFC found that "the basic purpose of the [antidumping] statute [is] determining current margins as accurately as possible." *Id.* at 8 Fed. Cir. (T) 68, 899 F.2d at 1191. Similarly, in *Allied–Signal Aerospace Co. v. United States,* 11 Fed. Cir. (T) ——, 996 F.2d 1185 (1993), the court found that

> the ITA's new policy is consistent with the statutory purpose underlying the BIA rules provided in 19 U.S.C. § 1677e, which is to facilitate the determination of dumping margins as accurately as possible within the confines of extremely short statutory deadlines.

*Id.* at 996 F.2d at 1191. Most recently, the court stated that

> [t]he purpose of the [Tariff] Act is to prevent dumping, an activity defined in terms of the marketplace. The Act sets forth procedures in an effort to determine margins "as accurately as possible."

*Lasko Metal Products, Inc. v. United States,* 43 F.3d 1442, 1446 (1994) (citation omitted).

Commerce holds a mélange of tools to effectuate the purpose of finding the most accurate dumping margins under the statute. Of most utility here, 19 U.S.C. § 1677b(c)(1) directs Commerce to value factors of production "in a market economy country or countries [Commerce] consider[s] to be appropriate."

While the Court recognizes that Commerce's focus is on obtaining pricing for factors of production from a surrogate country

at or near the same economic level of development, the statute specifically states "to the extent possible" and specifically contemplates the use of pricing from the United States. Plaintiffs contend that the "lodestar for valuing factor[s] of production" [2] under the statute is on "the comparability of economies in the home market and surrogate, not on the comparability of inputs . . . ." Plts.' Br. at 17 (emphasis omitted). However, even plaintiffs admit that "Congress recognized that valuing factors of production (materials and labor) with reference to a comparable economy would yield the fairest, most accurate comparisons." Plts.' Reply Br. at FN 2. The Court finds that Commerce's direction to determine comparable market economy countries is merely ·a means of achieving the primary end, which is determining the most accurate dumping margins possible. Plaintiffs' arguments have lost sight of the proverbial forest. In addition, courts have found that the statute, "does not say–anywhere–that the factors of production must be ascertained in a single fashion." *Lasko Metal Products, Inc. v. United States,* 43 F.3d 1442, 1446 (1994). The Court finds that Commerce's use of U.S. basswood prices to value Chinese lindenwood falls within the discretion granted to Commerce in administering the antidumping statute.

■ Plaintiffs maintain that the agency regulations contained in 19 C.F.R. § 353.52 prevents Commerce from utilizing surrogate values from any country that is not comparable in economic development such as the United States. Plt.s Reply Br. at 11. Plaintiffs claim that Commerce is required to strictly follow their own regulations. While that may be true, the Court is not bound by the agency regulations, but rather is obliged to apply the statutory provisions contained in 19 U.S.C. § 1677b. When plaintiffs observe that Commerce "largely focuses on the language of the statute, 19 U.S.C. § 1677b(c)(1)" to the neglect of Commerce's own regulations, plaintiffs inadvertently describe the force of law: the procedures contained in 19 C.F.R. § 353.52 are merely Commerce's own interpretation of the administration of 19

U.S.C. § 1677b(c)(1). 19 C.F.R. § 353.52 does not stand on its own and it does not have the force of the law. Commerce was correct in focusing on the provisions of the statute and not its own regulations.

■ Even under Commerce's regulations, plaintiffs contentions are misplaced. Plaintiffs assert that 19 C.F.R. § 353.52(c) stands alone when Commerce utilizes the factor of production analysis. Under 19 C.F.R. § 353.52(c), Commerce "will value the factors production in a nonstate–controlled–economy country which the Secretary considers comparable in economic development to the home market country." 19 C.F.R. § 353.52(c) (1989). Plaintiffs contend that this language precludes Commerce from utilizing any surrogate values from the United States since it is not a comparable economy country. 19 C.F.R. § 353.52(b) specifically contemplates the use of values from the United States but plaintiffs contend that subsection (b) applies only to subsection (a) and subsection (a) applies only when sales prices or constructed value is used as the basis for FMV, neither of which are used in the present case. The Court finds that 19 C.F.R. § 353.52 is an integrated implementing regulation that allows Commerce the discretion to utilize surrogate values from market economy countries provided the overarching objective of accuracy is achieved. Plaintiffs' attempt to separate subsection (c) from subsections (a) and (b) must fail since the plain reading of the factors of production analysis elucidated in subsection (c) is simply a means of deriving constructed value delineated in subsections (a) and (b). Without a link to constructed value, subsection (c) is rendered meaningless. The CAFC has found that the antidumping statute

> simply does not say –anywhere–that the factors of production must be ascertained in a single fashion. The [statute] requires the ITA determination to be based on the "best available information regarding the values of such factors in a market economy country or countries considered to be appropriate by the administering authority."

2. Plts.' Reply Br. at 7.

*Lasko Metal Products, Inc. v. United States,* 43 F.3d 1442, 1446 (1994).

The Court finds that Commerce acted within the primary objective of determining the most accurate dumping margins by using U.S. basswood prices to value Chinese lindenwood. Plaintiffs never assert that jelutong provides a more accurate value than does basswood. All of the evidence provided to the Court cites the most similar wood to Chinese lindenwood to be U.S. basswood. The Court finds that Commerce's use of U.S. basswood prices as a surrogate for Chinese lindenwood is based on substantial evidence and otherwise in accordance with law.

### C. Lacquer, Ferrule and Eraser Surrogate Pricing

In the Preliminary Determination, Commerce used Indian import statistics for the pencil ferrules and an "import statistics category identified by the respondent" for the pencil paint or lacquer. *Notice of Preliminary Determination of Sales at Less Than Fair Value: Certain Cased Pencils From the People's Republic of China,* 59 Fed.Reg. 30,-911, 30,914 (1994). Respondents questioned the quality of the Indian prices and Commerce decided "that the Indian values for ferrules, erasers and paint were aberrational." *Notice of Final Determination of Sales at Less Than Fair Value: Certain Cased Pencils From the People's Republic of China,* 59 Fed.Reg. 55,625, 55,630 (1994). Commerce valued ferrules, erasers and lacquer, using Pakistani import statistics. *Id.* Plaintiffs challenge Commerce's determination that the Indian import statistics were aberrational asserting that the decision was "based on several demonstrably false premises, and should be rejected...." Plts.' Reply Br. at 43.

■ The Court finds that Commerce acted within its discretion in using Pakistani import values for ferrules, erasers and lacquer. Commerce compared the difference between Indian values and the benchmark U.S. values to the difference between the Pakistani values and the U.S. benchmark values for the three materials. Def.'s Br. at 11. The U.S. benchmark values were provided in the antidumping petition by plaintiffs

and represented the only other source of prices for these inputs. *Id.* In the results of the comparison, Commerce found an "extraordinarily high difference between the Indian value and the benchmark U.S. value for these factors, when compared to the difference between the Pakistani value and the benchmark U.S. value." *Id.* (citation omitted). In addition, Commerce determined that the Pakistani values were based on more "commercially reliable import values." *Id.* at 55.

■ Plaintiffs impugned Commerce's decision not to use the narrowly drawn Indian tariff category values for lacquer opting instead to use the broader Pakistani tariff category values. Commerce readily admits that the Indian tariff category is more narrowly tailored to the lacquer used in the pencil production but the Indian values for ferrules, erasers and lacquer were "aberrational by any measure." *Id.* at 56. Commerce also determined that the volume represented by the Indian values were less than a third of the volume of the Pakistani values bringing into question the reliability of the Indian data. The Court has found that comparison of surrogate data with U.S. data is within "Commerce's statutory authority and consistent with past practice." *Olympia Industrial, Inc. v. United States,* 1997 WL 181529, 21 CIT ——, ——, Slip Op. 97–44 at 12 (April 10, 1997). With respect to Commerce's decision to use Pakistani values over Indian values, the Court finds that the plaintiffs are assailing the correctness of the result, not Commerce's methodology, which is outside the Court's standard of review. The Court abstains from determining which surrogate value is correct. It is clear to the Court that Commerce's methodology in obtaining and utilizing Pakistani values for these inputs was appropriate in determining the primary objective of calculating the most accurate dumping margins.

Plaintiffs cite *Sigma Corp. v. United States,* 19 CIT ——, 888 F.Supp. 159 (1995) ("*Sigma I*"), for the proposition that "it is improper to use tariff items covering inappropriate surrogate materials in lieu of another tariff item that covers the appropriate

surrogate material." Plts.' Reply Br. at 47. However, in *Sigma I* Commerce used a basket category that did not include the input in question. As the Court stated:

> In relying upon this data, Commerce failed to properly consider whether using both categories was reasonably reflective of the price of pig iron used to manufacture castings in the PRC.

*Sigma Corp. v. United States,* 19 CIT ——, ——, 888 F.Supp. 159, 162 (1995). In contrast, in the instant case Commerce used a basket category that most certainly included the subject merchandise, albeit with a number of other products. In the instant case, plaintiffs made no showing that the Pakistani tariff category did not include the subject inputs. Although the Pakistani data was more broad, Commerce determined that the Indian values were aberrational and unreliable based on substantial evidence in the record. The *Sigma II* court specifically validated this approach when it found that "such variations are accounted for by the averaging inherent in the prices reflected in import statistics." *Sigma Corp. v. United States,* 19 CIT ——, ——, 890 F.Supp. 1077, 1083 (1995) ("*Sigma II*").

There is ample evidence in the record to support Commerce's conclusion that the Indian values were aberrational and unreliable. The Court affirms Commerce's decision to base ferrule, eraser and lacquer values on Pakistani data.

## II. Import Tariffs

Commerce excluded the amount of Indian, Pakistani and Indonesian import tariffs from the respective surrogate input values based on the fact that the tariffs would have been rebated upon exportation of the finished product to the United States. *Notice of Final Determination of Sales at Less Than Fair Value: Certain Cased Pencils From the People's Republic of China,* 59 Fed.Reg. 55,-625, 55,634 (1994). Commerce explained that its "purpose in employing its factors of production methodology is to value the merchandise as produced in the NME for export to the United States." Def.'s Br. at 12 (citing *Notice of Final Determination of Sales at Less Than Fair Value: Certain Cased Pencils From the People's Republic of China,* 59

Fed.Reg. 55,625, 55,634 (1994)). Plaintiffs claim that the statute requires Commerce to determine "the surrogate cost of **producing** the merchandise, and does not permit the deductions relating to post-exportation events from that cost." Plts.' Reply Br. at 50 (emphasis original).

■ The Court finds that import duties that are subsequently rebated are properly excluded from surrogate values used to calculate FMV. Plaintiffs contend that the plain reading of the antidumping statute effectively precludes Commerce from altering the calculation of FMV once the subject merchandise is physically produced. Plts.' Reply Br. at 49. The statute reads:

> the administering authority shall determine the foreign market value of the merchandise on the basis of the value of the factors of production utilized in producing the merchandise and to which shall be added an amount for general expenses and profit plus the cost of containers, coverings, and other expenses, as required by subsection (e) of this section.
>
> (e) Constructed value
>
> (1) Determination
>
> For the purposes of this subtitle, the constructed value of imported merchandise shall be the sum of –
>
> (A) the cost of materials (exclusive of any internal tax applicable in the country of exportation directly to such material or their disposition, but remitted or refunded upon the exportation of the article in the production of which such materials are used) and of fabrication or other processing of any kind employed in producing such or similar merchandise, at a time preceding the date of exportation of the merchandise under consideration which would ordinarily permit the production of that particular merchandise in the ordinary course of business; . . .

19 U.S.C. § 1677(b)(c)(1)(e) (1988). The Court finds that plaintiffs arguments are misplaced for two reasons. First, the statute contemplates all costs up and until exportation which would include any duty drawbacks

or refunds on inputs remitted before physical exportation. Second, the statute specifically speaks to the exclusion of the internal taxes that are refunded in the calculation of constructed value. The Court finds that the same rule applies to surrogate values obtained of inputs when calculating constructed value and FMV.

The Court has previously addressed this very issue. In all of the countries where surrogate values were utilized, there was a duty drawback system in effect that exempted or reimbursed exporters the payment of import duties. In *Sigma I*, the Court found that import duties that were subsequently rebated were properly deducted from the surrogate value. The Court stated that Commerce

> properly did not include costs for customs duties and other add-ons because, with regard to duties and indirect taxes, India operates a duty draw back system that rebates the amount of duties paid on input materials when the finished product is re-exported. Because Commerce is seeking to obtain a surrogate value for the finished product as exported, Commerce properly presumed that any duties and indirect taxes collected upon importation into India are rebated upon exportation of the finished product.

*Sigma Corp. v. United States*, 19 CIT ——, ——, 888 F.Supp. 159, 162 (1995). The Court finds that Commerce's exclusion of import taxes on the surrogate values utilized in its factors of production analysis is supported by substantial evidence and otherwise in accordance with law.

## III. Transportation, General, Selling and Administrative Expenses

Commerce initially contacted the PRC's Ministry of Foreign Trade and Economic Cooperation ("MOFTEC") and certain identified companies requesting information on the manufacturers and exporters of pencils sold to the United States. Commerce requested that MOFTEC identify those pencil manufacturers and exporters and to forward to these identified companies Commerce's initial survey in the investigation. Commerce used its two-tiered system of assigning dumping margins, where lower margins were assigned to respondents to the survey who cooperated in the investigation and higher margins, the so-called country-wide or "all others" margin, to those companies who did not cooperate. *Notice of Final Determination of Sales at Less Than Fair Value: Certain Cased Pencils from the People's Republic of China*, 59 Fed. Reg. 55,625, 55,630 (1994). In determining the all others dumping margin, Commerce assigns the higher of (1) the highest margin alleged in the petition, or (2) the highest calculated rate of any respondent in the investigation using the best information available ("BIA") pursuant to 19 U.S.C. § 1677e(c).

In the instant case, Commerce determined that those non-responding companies effectively did not cooperate and subsequently assigned to them the highest margin alleged in the petition. The dumping margin in the petition was calculated by plaintiffs using the statutory minimum percentage of 10 percent for sales, general and administrative ("SG & A") expenses and excluded costs associated with transportation, port handling, loading and containerization costs ("transportation expenses"). Commerce recalculated the petition dumping margin on the basis of plaintiffs' updated information submitted in May, 1994, and the surrogate value of U.S. basswood. Commerce assigned participating respondents surrogate values for both GS & A and transportation expenses in calculating their dumping margins. *Notice of Final Determination of Sales at Less Than Fair Value: Certain Cased Pencils from the People's Republic of China*, 59 Fed.Reg. 55,625, 55,630 (1994). Plaintiffs argue that the all others rate should be reformulated using the surrogate values for GS & A and transportation expenses since Commerce substituted U.S. basswood values. Plaintiffs maintain that Commerce must uniformly apply its substitution factors in a non-arbitrary fashion.

■ The Court finds that Commerce's recalculation of the petition margin and its assignment as the all others rate was within the discretion granted to Commerce under the statute. The statute requires that Commerce:

shall, whenever a party or any other person refuses or is unable to produce information requested in a timely manner and in the form required, or otherwise significantly impedes an investigation, use the best information otherwise available.

19 U.S.C. § 1677e(c) (1988). In determining the all others rate, Commerce is empowered with wide latitude in its calculations. Commerce is not confined to the specific procedures under 19 U.S.C. § 1677b(c) or § 1677b(e), but rather is guided by 19 U.S.C. § 1677e. The all others rate does not fall under the ambit of an accurately determinable figure. By its very nature, the all others rate is nothing more than a prognostication of constructed value from manufacturers about whom nothing is known. From the prolix of investigations and subsequent litigation, it is apparent that formulating dumping margins from manufacturers that fully comply with the investigation and supply complete questionnaires is not an exact science; formulating the all others dumping margin is another step removed from exactitude. BIA is a set of data from which Commerce has the discretion to employ in calculating the all others dumping margin. It is clear that Commerce used a number of values from multiple sources, all from a proper set of possible alternatives within the range of its discretion. The Court finds that Commerce's calculation of transportation, selling, general and administrative expenses is supported by substantial evidence and is otherwise in accordance with law.

### IV. Separate Rates

In the Final Determination, Commerce assigned separate rates to the four participating exporters that requested them; SFTC, Guangdong, China First and Lansheng. *Notice of Final Determination of Sales at Less Than Fair Value: Certain Cased Pencils from the People's Republic of China*, 59 Fed. Reg. 55,625, 55,626 (1994). Commerce employed its standard practice to determine "whether the exporter through whom the producer's merchandise is sold [in] the Unit-

ed States has an export license or, instead, restricted in its export activity, in making its determination of entitlement to separate antidumping duty rates." Def.'s Br. at 81 (emphasis omitted). Plaintiffs argue that Commerce erred by not considering whether the export restrictions imposed by the PRC government "constituted for those exporters that had been granted export privileges the manipulation of prices or other interference with their business with the United States, . . ." Plts.' Reply Br. at 61 (emphasis omitted).

 The Court finds that Commerce properly assigned separate dumping margins for the four requesting compliant exporters. Commerce has instituted an elaborate methodology to determine whether governmental restrictions control exporting companies. To determine whether there is an absence of legal, or *de jure*, governmental control, Commerce looks to three elements:

(1) an absence of restrictive stipulations associated with an individual exporter's business and export licenses

(2) any legislative enactments decentralizing control of companies

(3) any other formal measures by the government decentralizing control of companies

*Tianjin Machinery Import & Export Corp. v. United States*, 16 CIT 931, 935, 806 F.Supp. 1008, 1014 (1992) (affirming Commerce's practice in *Sparklers from the People's Republic of China*, 56 Fed.Reg. 20,588, 20,589 (1991)). In determining the absence of factual, or *de facto*, government control, Commerce examines:

(1) whether each exporter sets its own export prices independently of the government and other exporters

(2) whether each exporter can keep the proceeds from its sales

*Id.* The Court accepts Commerce's approach of determining government control, both *de jure* and *de facto*, as a proper administration of the antidumping statute.[3] Com-

---

**3.** The Court has previously affirmed Commerce's *de jure* and *de facto* governmental control tests in *Tianjin Machinery Import & Export Corp. v. Unit-*

*ed States*, 16 CIT 931, 935, 806 F.Supp. 1008, 1014 (1992) and in *Sigma Corp. v. United States*,

merce found that the four exporters satisfied all of the tests for absence of governmental control in exhaustive detail. *Notice of Final Determination of Sales at Less Than Fair Value: Certain Cased Pencils from the People's Republic of China,* 59 Fed.Reg. 55,625, 55,626–29 (1994). The Court finds that Commerce's methodology was proper and provided substantial evidence on the record to support the conclusion that the four exporters were entitled to separate dumping margins.

Plaintiffs claim that the standard for separate rate entitlement is whether central or subcentral governments have manipulated export prices or interfered with other aspects of conducting business in the United States. Plts.' Reply Br. at 60 (citing *Silicon Carbide from the People's Republic of China,* 59 Fed. Reg. 22585, 22588 (1994)).[4] The Court finds that the two-part standard that Commerce employed in its investigation is considerably more comprehensive than the standard that plaintiffs advocate. Commerce's rigorous treatment of the issue satisfies any standard for separate rate entitlement. Plaintiffs provided no evidence that there indeed was any governmental interference with prices or other aspects of conducting business in the United States; plaintiffs merely contend that Commerce did not follow their previous methodology. Plaintiffs' unsupported argument falls well short of evidence needed to disturb Commerce's sweeping examination of governmental control. The Court finds that Commerce's thorough examination following their approved methodology is supported by substantial evidence on the record and otherwise in accordance with law.

### V. Remand Determination

Pursuant to the remand by the Court, Commerce formulated a valuation methodology for pencil wood input and subsequently calculated prices for the surrogate value. Commerce was required to locate pricing for U.S. basswood that most closely matched the lindenwood used in the production of pencils in the PRC. Pencils are manufactured using the raw input of sawn wood or logs which are cut to produce slats which are further shaped to produce the wood component of pencils. Commerce calculated the surrogate value of basswood slats, used as an input by China First, and basswood logs, used for an input by Three Star and Anhui. Commerce then determined that the best information available on U.S. basswood was publicly available published information ("PAPI") found in *Sawlog Bulletin,* for log prices, and *Hardwood Weekly Review,* for wood slat prices. The Court finds that Commerce's conclusions set forth in the Remand Determination are supported by substantial evidence on the record and otherwise in accordance with law.

### A. Wood Slat Valuation

On remand, Commerce determined the surrogate value for wood slats used by China First to produce pencils. Plaintiffs and intervenors argue that Commerce's Remand Determination concerning slat valuation was flawed for four reasons: (1) selection of the proper grade of U.S. basswood; (2) selection of 4/4 inch basswood lumber; (3) selection of a percentage loss rate in the making of slats; and (4) adjustment for labor used in producing slats. The Court finds that Commerce's Remand Determination with respect to slat valuation was supported by substantial evidence on the record and otherwise in accordance with law.

Commerce determined that China First used slats that corresponded to Grades 1, 2, and 3. In an effort to accurately ascertain surrogate values for each grade, Commerce concluded that "sawn basswood grades Select/Better, # 1 Common, and # 2 Common corresponded to Grades 1, 2 and 3 described in the Chinese Broadleaves Standard." Def.'s Br. at 107. Commerce proceeded to value slats using an average price for Select/Better # 1 Common and # 2 Common sawn basswood grades in "proportion corresponding to the distribution of the slat type actually used...." *Id.* Intervenors contend

---

17 CIT 1288, 1302, 841 F.Supp. 1255, 1266 (1993).

4. "There is no evidence that these governments (1) can manipulate export prices or (2) interfere with other aspects of conducting business with the United States. Therefore, we determine that IMI/E, QI/E, and SGW are not subject to government control of their silicon carbide exports." *Silicon Carbide from the People's Republic of China,* 59 Fed.Reg. 22585, 22588 (1994).

that Commerce did not verify the quality of the slats that China First used in the production of pencils. Def.-Intervenors' Br. at 21. Intervenors maintain that "Commerce should be required to conduct a supplemental verification of China First's actual slat grade usage." *Id.* The Court finds that Commerce properly determined the slat grade since the Remand Determination focused on new information provided by intervenors and compared it to the verified information already on the record. Intervenors were unable to support their claim that the information that they provided for the Remand Determination was more accurate than their previously submitted and verified information. Remand Determination at 9–10.

Plaintiffs contested Commerce's use of 4/4 inch thickness basswood slat values stating that Commerce should have used 12/4 (three inch) thickness instead. Plts.' Reply Br. at 64. Plaintiffs asserts that 4/4 thickness wood cannot be used to make a pencil slat. China First actually purchased slats measuring 1/4 inch thick and Commerce determined that 4/4 inch thick basswood slats were the closest surrogate. Remand Determination at 11. The Court finds that Commerce's use of the 4/4 inch basswood value furthers the objective of determining the most accurate and reliable surrogate.

In processing wood to make pencils, there is a certain amount of loss from drying and cutting the raw material, green/air dried basswood sawn lumber. Commerce determined that the most accurate loss rate was provided by China First in its verified response in creating pencils from wood slats. Plaintiffs provided a loss rate of 27%, based on the actual loss rate of 12/4 thickness sawn lumber which is significantly higher than the loss rate Commerce used. Plaintiffs contend that a higher loss rate should be used since loss is inversely related to sawn lumber thickness. Intervenors argue that no loss rate should apply since China First records no loss in producing pencil slats from wood slats. The Court finds that Commerce properly determined the loss rate based on the evidence on the record.

Commerce did not include a separate labor figure in determining the surrogate slat values. Commerce stated that the labor required to process sawn lumber into wood slats was incorporated into the surrogate prices that were utilized in the Remand Determination. Plaintiffs argue that Commerce erred by presuming that sawn lumber and wood slats are identical. Plts.' Reply Br. at 69. The Court finds that Commerce properly considered the labor costs in the production of wood slats based upon the surrogate values that Commerce employed in the Remand Determination from the record evidence. The Court finds that Commerce's determination of the surrogate value for slats was supported by substantial evidence on the record and otherwise in accordance with law.

## B. Log Valuation

■ Commerce calculated the surrogate value of logs used by Anhui and Three Star on remand. Plaintiffs contend that Commerce's Remand Determination was flawed for three reasons: (1) Commerce's use of PAPI to value logs; (2) Commerce's treatment of the weight of green basswood logs; and (3) Commerce's selection of the width of logs and other price discrepancies. The Court finds that Commerce's Remand Determination regarding the valuation of logs was based on substantial evidence and otherwise in accordance with law.

Plaintiffs contend that Commerce neglected to use the most accurate pricing for basswood logs contained in a study prepared by an expert for plaintiffs. Plts.' Br. at 70. Commerce used prices from a public trade journal instead, following previous practice. The Court finds that the use of PAPI serves two purposes: first, it provides accurate information accepted by the market and second, it represents a reliable source insulated from conflicts of interest. Plaintiffs' submitted information lacks the inherent reliability that PAPI provides. The Court finds that Commerce's reliance on PAPI is a reasonable means of determining surrogate values, fostering both policy aims of finding the best information available and calculating the most accurate dumping margins.

Commerce valued basswood logs using the equation of one cubic meter equals 490 kg. representing a verified questionnaire response from the PRC pencil producers.

Def.'s Br. at 98. Plaintiffs maintain that Anhui and Three Star purchased green wood as a raw material input and the correct weight of green basswood logs is 913 kg. and the 490 kg. figure applies to basswood in the dried state. Plts.' Reply Br. at 74. However, the evidence does not establish that the 490 kg. figure is for dried basswood. The Court finds that the record evidence supports Commerce's use of the 490 kg. figure since it is a verified raw material input.

Commerce valued basswood logs based on PAPI from an industry journal and from consultations with five U.S. lumber mills. Def.'s Br. at 103. Plaintiffs argue that Commerce's valuation did not include all logs of the proper width as reported and the valuation omitted reported log prices that were aberrationally low. Plts.' Reply Br. at 75–76. The Court finds that Commerce went to great lengths in calculating the value of basswood logs. Commerce was within their statutory discretion to include and exclude log prices that were considered to be inside or outside of the scope of the surrogate value calculation.

Finally, Commerce calculated the all others rate based on the plaintiffs' petition readjusted to account for wood valuation data obtained in the remand proceedings. Plaintiffs argue that the calculation of the all others rate should include the 27% loss rate incurred in lumber to slat manufacturing. *Id.* at 76. As the Court has stated, the all others rate does not fall under the ambit of an accurately determinable figure. By its very nature, the all others rate is nothing more than a prognostication of constructed value from manufacturers about whom noth-

ing is known. BIA is a set of data from which Commerce has the discretion to employ in calculating the all others dumping margin. Therefore, the Court finds that Commerce's valuation of logs was based on substantial evidence and otherwise in accordance with law.

### *Conclusion*

For the foregoing reasons, the Court affirms Commerce's Remand Determination in all respects.

### JUDGMENT

Upon consideration of plaintiffs' motion for judgment upon the agency record, plaintiffs' and defendant-intervenors' comments to the Remand Determination of defendant, defendant's and defendant-intervenors' opposition to the plaintiffs' motion, plaintiffs' response, oral argument and all other papers and proceedings, it is hereby

**ORDERED** that the plaintiffs' motion is denied; and it is further

**ORDERED** that the plaintiffs' and defendant-intervenors' requests for remand are denied; and it is further

**ORDERED** that defendant's Remand Determination is affirmed and adopted in all respects.