Slip Op. 10-134

UNITED STATES COURT OF INTERNATIONAL TRADE

_____
                                :
JINING YONGJIA TRADE CO.,       :
LTD., QINGDAO TIANTAIXING       :
FOODS CO., LTD., and HEBEI      :
GOLDEN BIRD TRADING CO., LTD.,  :
                                :
          Plaintiffs,           :  Before: Richard K. Eaton, Judge
                                :
     v.                         :  Court No. 08-00386
                                :
UNITED STATES,                  :
                                :
              Defendant,        :
                                :
     and                        :
                                :
FRESH GARLIC PRODUCERS          :
ASSOCIATION, CHRISTOPHER        :
RANCH LLC, THE GARLIC COMPANY,  :
VALLEY GARLIC, and VESSEY AND   :
COMPANY,                        :
                                :
              Def.-Ints.        :
_____ :


OPINION

[Denying plaintiffs' motion for judgment on the agency record and sustaining Department of Commerce's final determination.]

Dated: December 16, 2010

*Trade Bridge* (*Li Jasmine Zhao*), for plaintiffs.

*Tony West*, Assistant Attorney General; *Jeanne E. Davidson*, Director, *Reginald T. Blades, Jr.*, Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice (*Richard P. Schroeder*); Office of the Chief Counsel for Import Administration, United States Department of Commerce (*Scott McBride*), of counsel, for defendant.

*Kelley Drye & Warren, LLP* (*Michael J. Coursey and John M. Herrmann*), for defendant-intervenors.

Eaton, Judge:  This matter is before the court on the motion for judgment on the agency record of plaintiffs Jining Yongjia Trade Co., Ltd. ("Yongjia"), Qingdao Tiantaixing Foods Co., Ltd. ("QTF"), and Hebei Golden Bird Trading Co., Ltd. ("Golden Bird") (collectively, "plaintiffs").  See Pls.' Br. Supp. Mot. J. Agency R. ("Pls.' Br.").  Defendant the United States and defendant-intervenors the Fresh Garlic Producers Association, Christopher Ranch LLC, The Garlic Company, Valley Garlic, and Vessey and Company (collectively, "defendant-intervenors") oppose the motion.  See Def.'s Mem. Opp. Pls.' Mot. J. Agency R. ("Def.'s Mem."); Def-Ints.' Br. Resp. Pls.' Mot. J. Agency R ("Def.-Ints.' Br.").

By their motion, plaintiffs challenge the final results of the United States Department of Commerce's ("Commerce" or the "Department") twelfth new shipper reviews of the antidumping duty order on fresh garlic[1] from the People's Republic of China ("PRC" or "China") for the period of review November 1, 2006 to April

---

[1]     Fresh garlic under the antidumping duty order includes:

> all grades of garlic, whole or separated into
> constituent cloves, whether or not peeled,
> fresh, chilled, frozen, provisionally
> preserved, or packed in water or other
> neutral substance, but not prepared or
> preserved by the addition of other
> ingredients or heat processing.

Fresh Garlic from the PRC, 73 Fed. Reg. 24,042, 24,042 (Dep't of Commerce May 1, 2008) (preliminary results of the twelfth new shipper reviews) ("Preliminary Results").

30, 2007 ("POR").  *See* Fresh Garlic from the PRC, 73 Fed. Reg.

56,550 (Dep't of Commerce Sept. 29, 2008) (final results and

rescission, in part, of twelfth new shipper reviews) ("Final

Results") and the accompanying Issues and Decision Memorandum

("Issues & Dec. Mem.") (Dep't of Commerce Sept 19, 2008).

Jurisdiction lies pursuant to 28 U.S.C. § 1581(c) (2006) and 19

U.S.C. § 1516a(a)(2)(B)(iii) (2006).

For the reasons set forth below, the court denies

plaintiffs' motion and sustains Commerce's Final Results.


BACKGROUND

On May 21, 2007, plaintiffs asked Commerce to initiate new

shipper reviews on their sales of fresh garlic to the United

States.  Fresh Garlic from the PRC, 72 Fed. Reg. 38,057, 38,057-

58 (Dep't of Commerce, July 12, 2007) (initiation of antidumping

duty new shipper reviews).  Commerce initiated the twelfth new

shipper reviews on July 12, 2007.  *Id*. at 38,060.  The purpose

of a new shipper review is to determine whether an exporter or

producer is entitled to its own antidumping duty rate under an

order, and if so, to calculate that rate.  *See Hebei New Donghua*

*Amino Acid Co., Ltd., v. United States*, 29 CIT 603, 604, 374 F.

Supp. 2d 1333, 1335 (2005).

On May 1, 2008, Commerce published its preliminary results.

Fresh Garlic from the PRC, 73 Fed. Reg. 24,042, (Dep't of

Commerce May 1, 2008) (preliminary results of the twelfth new

shipper reviews) ("Preliminary Results").  In reaching its

Preliminary Results, Commerce compared each company's export

price[2] to normal value[3] in order to to determine if its sales

were at prices below fair value.  *See* 19 U.S.C. § 1677b(a).

Because China is a non-market economy ("NME"),[4] Commerce,

pursuant to 19 U.S.C. § 1677b(c)(1), selected India as the

surrogate country for purposes of calculating normal value.

---

[2]     The "export price" is "the price at which the subject
merchandise is first sold . . . by the producer or exporter of
the subject merchandise outside of the United States to an
unaffiliated purchaser in the United States or to an unaffiliated
purchaser for exportation to the United States," as adjusted by
19 U.S.C. § 1677a(c).  19 U.S.C. § 1677a(a).

[3]     Normal value is defined as

> the price at which the foreign like product
> is first sold (or, in the absence of a sale,
> offered for sale) for consumption in the
> exporting country, in the usual commercial
> quantities and in the ordinary course of
> trade and, to the extent practicable, at the
> same level of trade as the export price or
> constructed export price . . . .

19 U.S.C. § 1677b(a)(1)(B)(i).

[4]     A "nonmarket economy country" is "any foreign country
that [Commerce] determines does not operate on market principles
of cost or pricing structures, so that sales of merchandise in
such country do not reflect the fair value of the merchandise."
19 U.S.C. § 1677(18)(A).  "Because it deems China to be a
nonmarket economy country, Commerce generally considers
information on sales in China and financial information obtained
from Chinese producers to be unreliable for determining, under 19
U.S.C. § 1677b(a), the normal value of the subject merchandise."
*Shanghai Foreign Trade Enters. Co. v. United States*, 28 CIT 480,
481, 318 F. Supp. 2d 1339, 1341 (2004).

Preliminary Results, 73 Fed. Reg. at 24,044.  Commerce then

calculated the normal value of fresh garlic for QTF and Golden

Bird using its standard factors of production ("FOP")

methodology.[5]

For grower Yongjia, however, Commerce employed a modified

methodology to construct normal value that used the surrogate

value for the whole garlic bulb as an intermediate product.[6]  As

_____

[5]     Plaintiffs QTF and Golden Bird are processors and
exporters of garlic that purchase whole garlic bulbs and process
them for export.  In determining the standard FOPs for these
respondents, Commerce began with the surrogate value of the whole
garlic bulb. Preliminary Results, 73 Fed. Reg. at 24,045 n.4.

[6]     Commerce articulated the difference between the whole
garlic bulb and fresh garlic in the Issues and Decision
Memorandum for the tenth administrative review when it stated:

> It is important to distinguish the fact that
> the raw garlic bulb that is harvested from
> the ground, however, is not immediately
> shipped to the United States.  Rather, the
> garlic that PRC exporters ship to the United
> States requires at least a minimum amount of
> processing and packing prior to export.  We
> have learned through the conduct of several
> administrative and new shipper reviews that
> the garlic harvested from the ground is, at a
> minimum, cleaned to remove the outer skins in
> order to give the garlic bulb its
> characteristic white, fresh appearance.  This
> whole [garlic bulb] is then typically packed
> in mesh bags and cartons for shipment to the
> United States.  In the case of peeled garlic,
> the processing is more extensive and
> typically involves additional labor, energy,
> and several packing inputs (including the use
> of an antiseptic solution and nitrogen gas).

Fresh Garlic from the People PRC, 71 Fed. Reg. 26,329 (Dep't
                                        (continued...)

a result, the cost (or value) of the whole garlic bulb was used as a substitute for the costs of the growing and harvesting FOPs ("upstream FOPs") actually reported by Yongjia. The Department stated that it used this intermediate input methodology because it was unable to verify the values for Yongjia's upstream FOPs. Issues & Dec. Mem. at Comm. 2.

Commerce arrived at the value for whole garlic bulbs using a simple average of prices for the "Super A" grade garlic bulb in India from daily data published by the Azadpur Agricultural Produce Marketing Committee ("APMC") in its "Market Information Bulletin" ("APMC Bulletin"). Preliminary Results, 73 Fed. Reg. at 24,046. The Department published its final results on September 29, 2008, having calculated margins of 32.78 percent for QTF, 13.83 percent for Golden Bird, and 18.88 percent for Yongjia.[7] Final Results, 73 Fed. Reg. at 56,552. Yongjia contests the use of Commerce's intermediate input methodology in calculating its rate, but not the methodology itself. The other

---

[6](...continued)
Commerce May 4, 2006) (final results and partial rescission of antidumping Duty administrative reviews and final results of new shipper reviews) ("Tenth Admin. Review Final Results") and accompanying Issues and Decision Memorandum ("Tenth Admin. Review Issues & Dec. Mem.") at 13.

[7]   The small change in margins from the Preliminary Results to the Final Results was a result of Commerce adopting a revised wage rate of U.S. $1.04 for the PRC, as well as a post-preliminary results clarification/correction to the margin calculations with respect to the cost of mesh bags for all plaintiffs. Final Results, 73 Fed. Reg. at 56,551.

plaintiffs and Yongjia all challenge Commerce's decision to use the APMC Bulletin data for the surrogate value of the whole garlic bulbs.


## STANDARD OF REVIEW

The court must uphold a final determination by the Department in an antidumping proceeding unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Huaiyin Foreign Trade Corp. v. United States*, 322 F.3d 1369, 1374 (Fed. Cir. 2003) (internal citations omitted) ("*Huaiyin*"). The existence of substantial evidence is determined "by considering the record as a whole, including evidence that supports as well as evidence that 'fairly detracts from the substantiality of the evidence.'" *Id.* at 1374 (quoting *Atl. Sugar, Ltd. v. United States*, 744 F.2d 1556, 1562 (Fed. Cir. 1984)). The possibility of drawing two equally justifiable, yet inconsistent conclusions from the record does not prevent the agency's determination from being supported by substantial evidence. *See Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966); *Altx, Inc. v. United States*, 370 F.3d 1108, 1116 (Fed. Cir. 2004).

DISCUSSION

I.   Calculation of Normal Value

For merchandise exported from NMEs, Commerce "shall determine the normal value of the subject merchandise on the basis of the value of the factors of production used in producing the merchandise, to which shall be added an amount for general expenses and profit plus the cost of containers, coverings, and other expenses."  19 U.S.C. § 1677b(c)(1).  The statute directs Commerce to use the "best available information regarding the values of such factors . . . ."  *Id.*

Further, in valuing the FOPs, Commerce "shall utilize, to the extent possible, the prices or costs of factors of production in one or more market economy countries that are . . . (A) at a level of economic development comparable to that of the nonmarket economy country, and (B) significant producers of comparable merchandise."  *Id.* § 1677b(c)(4).  The FOPs used in the valuation include, but are not limited to: "(A) hours of labor required, (B) quantities of raw materials employed, (C) amounts of energy and other utilities consumed, and (D) representative capital cost, including depreciation."  *Id.* § 1677b(c)(3).

A.   Development of the Intermediate Input Methodology

In accordance with the NME statutory scheme outlined above, Commerce usually determines normal value based on the FOPs as

reported by respondents. *See* 19 U.S.C. § 1677b(c)(1), (3).  In
valuing the FOPs, the Department uses the cost that would have
been incurred for each of them in a surrogate country.  In the
two periodic administrative reviews that preceded Yongjia's
request for a new shipper review, however, Commerce questioned
the use of its normal factors of production methodology for the
respondents that grew garlic because of vagaries in the reporting
of the FOPs for garlic farming in China.

Specifically, in the ninth administrative review, Commerce
found that environmental factors, not within the control of the
farmers, i.e., weather, were difficult to accurately record and
could impact growth patterns and yield rates.  Fresh Garlic from
the PRC, 70 Fed. Reg. 34,082 (Dep't of Commerce June 13, 2005)
(final results of ninth administrative review) and accompanying
Issues and Decision Memorandum ("Ninth Admin. Review Issues &
Dec. Mem.") at 11-12.  The Department also found that respondents
were not able to "capture or record in their books and records
information such as the amount of fertilizer blown away by wind
or the amount of seed destroyed by a heavy rainfall."  *Id.* at 12.

In addition, Commerce found it important that respondents
did not own the land on which the garlic was grown.  *Id*.  Garlic
has an eight-to-nine month growing season, and because
respondents leased the land, three or four months out of the year
other crops were grown on it.  *Id.*  As a result, respondents had

no control over the land for this time period and the effect on the land of the "off season" crops was not reported by respondents. *Id*. Commerce found significant "the effect that such crops might have on the acidity or nitrogen content of the soil, [and that] farmers using this land might use liquid or granular herbicide or pesticide that remains on the land or in the soil and benefits subsequent crops." *Id*. Thus, for the Department, the possible effects of these off season activities "might explain a poor, or positive, yield in the subsequent garlic crops, and none of this will appear in the breakdown of FOPs provided in a respondents' [sic] books and records, thereby diminishing the respondents' [sic] ability to measure and report accurate FOPs to the Department." *Id*.

Commerce also expressed concern that the respondents in the ninth administrative review did not "keep the types of books and records that would allow the Department to establish the appropriateness or accuracy of the reported FOPs." Ninth Admin. Review Issues & Dec. Mem. at 12. According to the Department, the deficiencies in the respondents' records could not be corrected by on-site reviews because the long growing and harvesting process for garlic did not permit it to observe planting, growing and harvesting activities in the PRC, and, thus, Commerce could "conduct only paper verifications" of these processes. *Id*. at 13.

Commerce continued to use its usual FOP methodology in the ninth administrative review, but stated that it "intend[ed] in future administrative reviews to examine whether or not, and the extent to which, standard verification procedures can be applied to respondents' books and records, as they relate to the growing and harvesting FOPs of fresh garlic in the PRC." *Id*. The Department also stated that it "intend[ed] to examine more closely the ability of respondents to provide accurate, complete and most importantly, verifiable FOP data in questionnaire responses to the Department, when the normal books and records of these respondents apparently do not reflect all of the information relevant to such an analysis." *Id*.

Following its stated intentions from the ninth administrative review, Commerce, in the tenth administrative review, concluded that it would endeavor to capture the complete costs of producing "fresh garlic" by valuing the "fresh garlic bulb" as an intermediate product. Fresh Garlic from the People PRC, 71 Fed. Reg. 26,329 (Dep't Commerce May 4, 2006) (final results and partial rescission of antidumping duty administrative reviews and final results of new shipper reviews) ("Tenth Admin. Review Final Results") and accompanying Issues and Decision Memorandum ("Tenth Admin. Review Issues & Dec. Mem.") at Comm.

1.[8]  Because of this change, rather than base normal value on the

sum of surrogate values for the upstream FOPs reported by

respondents, Commerce would assume that these costs were all

contained in the price of the end product, the whole garlic bulb

itself.

Building on the findings it made during the ninth

administrative review, in the tenth administrative review,

Commerce found that "respondents in this industry do not track

actual labor hours incurred for growing, tending, and harvesting

activities and, thus, do not maintain appropriate records which

would allow them to quantify, report and substantiate this

information."  Tenth Admin. Review Issues & Dec. Mem. at 11.  In

addition, Commerce found "significant problems with respondents'

ability to report yield loss that results from the shrinkage that

occurs during the production of garlic."  *Id.*  The Department

"noted that there are many unknown variables that may affect or

influence reported FOPs which are not accounted for in the

respondents' books and records."  *Id*.  Commerce also concluded

that "the respondents also differed significantly in how each

reported its garlic seed usage."  *Id*.  Finally, Commerce

"determined that the books and records maintained by the

respondents do not report or account for all of the relevant

_____

[8]     The tenth administrative review is currently before
this Court in *Jinan Yipin Corp., Ltd. v. United States*, Court No.
06-00189.

information and do not allow the respondents to identify all of the FOPs necessary to grow and harvest garlic, which significantly inhibits the Department's ability to conduct a meaningful verification of reported information"  *Id.*

Based on these findings, the Department determined that an intermediate input methodology was appropriate for growers of fresh garlic beginning with those in the tenth administrative review.  *Id.*  The tenth administrative review, however, was not the first time that the Department had used an intermediate input methodology.  Commerce had previously relied on this methodology in the *Certain Frozen Fish Fillets* less than fair value determination.  *See* Certain Frozen Fish Fillets From the Socialist Republic of Vietnam, 68 Fed. Reg. 4986, 4993 (Dep't of Commerce Jan. 31, 2003) (notice of preliminary determination of sales at less than fair value, affirmative preliminary determination of critical circumstances and postponement of final determination) ("*Fish Fillets*").[9]

---

[9]     Commerce's determination to use an intermediate input methodology in *Fish Fillets* was challenged before this Court in *An Giang Agriculture & Food Import Export Co. v. United States*, Court No. 03-00563.  The case was voluntarily dismissed following the ruling in *Anshan Iron and Steel Co. v. United States*, 29 CIT 306, 307, 366 F. Supp. 2d. 1280, 1280 (2005), that Commerce had, on remand, sufficiently explained it decision to value the respondents' self-made intermediate inputs by specifically explaining why the upstream FOPs were unreliable.  *See Anshan Iron and Steel Co. v. United States,* 28 CIT 1728, 1737-38, 358 F. Supp. 2d 1236, 1244 (2004) ("If Commerce concludes that the value obtained from reliance upon Plaintiff's values for its factors of
(continued...)

In *Fish Fillets*, Commerce set out two exceptions to the standard FOP analysis that would permit the use of a surrogate value for an intermediate input.  The second of these was where "it is clear that attempting to value the factors used in a production process yielding an intermediate product would lead to an inaccurate result because a significant element of cost would not be adequately accounted for in the overall factors buildup." *Fish Fillets*, 68 Fed. Reg. at 4993.  Commerce referenced this second exception from *Fish Fillets* in the tenth administrative review, and determined to use the value of the whole garlic bulb as the starting point to construct normal value.  Tenth Admin. Review Issues & Dec. Mem. at 4.

B.    Application of the Intermediate Input Methodology in the Current Review

Having employed the intermediate input methodology for existing shippers in the tenth administrative reviews, Commerce decided to continue this practice for Yongjia in the new shipper review now before the court.  Preliminary Results, 73 Fed. Reg. at 24,045.  In this new shipper review, Commerce found that Yongjia was the only respondent that farmed garlic (rather than

---

[9](...continued)
production for self-produced intermediate inputs would not fulfill its statutory obligation to use the best available information, it must specifically describe how the information is unreliable.").

buying it), and further concluded that the company "was unable to accurately record and substantiate the complete costs of growing garlic during the POR." *Id.* In other words, even though Yongjia grew its own garlic and supplied Commerce with the claimed upstream FOPs used in farming its product, Commerce found, as it had found with growers in the tenth administrative review, that it could not achieve an accurate result in constructing normal value if it used the FOPs reported by respondent. "The alternative to the standard FOP analysis, as articulated in *Fish Fillets*, is only applied when the Department conclude[s] that it simply is unable to apply the FOP analysis to a Respondent's overall reported data." Issues & Dec. Mem. at Comm. 2.

Thus, the Department decided to construct the company's normal value using the price for whole garlic bulbs sold in India as a beginning point, just as it had for shippers who farmed garlic in the tenth administrative review. Def.'s Mem. 13 ("Commerce found 'significant discrepancies between what Yongjia reported and what [Commerce] observed' at verification. Specifically, Commerce concluded that Yongjia's books and records did not accurately report factors of production relating to labor, yield loss, cold storage electricity, off-season activities, water usage and land usage.").

Yongjia does not question Commerce's practice of using its intermediate input methodology. Indeed, the company concedes the

Department may employ the methodology under the right set of

circumstances.  Rather, Yongjia disputes the methodology's use in

this case.[10]  Pls.' Br. 16.  In doing so, Yongjia claims that

Commerce's decision to use its intermediate input methodology was

not supported by substantial evidence.  Pls.' Br. 16 ("Although

Commerce has discretion to resort to intermediate input, such

discretion need to be validated by substantial evidence.").

     The company argues that its upstream FOPs could have been

valued by the Department and that the use of the second *Fish

Fillets* exception to the standard FOP methodology was not

supported by substantial evidence.  Pls.' Br. 16 ("[I]t is

completely necessary for Commerce to provide sufficient evidence

to prove that a respondent is not able to provide sufficient

factual evidence that it fails to maintain the necessary

information in its internal books and records that would allow

Commerce to establish the completeness and accuracy of the

reported FOPs.  The hurdle shall be higher.  Minor findings of

discrepancies or a different calculation method shall not be

---

[10]     At no point in their complaint do plaintiffs question
Commerce's authority to use its intermediate input methodology as
set out in *Fish Fillets*.  *See generally* Compl.  Thus, the
legality of the intermediate input methodology is not before the
court.  The court, therefore,  expresses no opinion as to whether
the methodology complies with 19 U.S.C. § 1677b(c)(1) and (3).
It is worth noting, however, that the results in this case would
be the same if, rather than using its intermediate input
methodology, Commerce had chosen to treat the whole garlic bulb
as a raw material.  *See* 19 U.S.C. § 1677b(c)(3)(B).

taken as sufficient evidence."). Yongjia insists that the intermediate input methodology cannot be used here because Yongjia provided complete and accurate FOP information, and, therefore, the normal FOP methodology should have been applied in calculating its normal value. Pls.' Br. 17.

The Department reached its conclusion that Yongjia could not accurately account for the upstream FOPs by evaluating the company's questionnaire responses and by making a site visit to the garlic fields. Commerce detailed its findings in the Issues and Decision Memorandum, setting out the problems it found with a number of the FOPs reported by Yongjia, i.e., it found: (1) that "Yongjia was unable to accurately track labor hours;" (2) that there were "problems with Yongjia's ability to report yield loss resulting from the shrinkage that occurs during the production of garlic;" (3) that there existed "major discrepancies between the farming labor reported and that observed during verification . . . [and] that Yongjia underreported harvesting labor in excess of 15 percent;" (4) that Yongjia did not weigh the harvested garlic for several weeks after harvest, and thus failed to take into account any yield loss from the garlic drying out; (5) that based on its finding that "Yongjia was unable to accurately report the garlic stored in its cold storage facility and because we were unable to verify its main electricity meter," that it did "not have the information necessary to accurately capture a proper

cold storage electricity FOP;" (6) "that the reported water used for irrigation of the garlic crop was based on an estimate rather than actual water consumption;" (7) that supported by its knowledge of "the known structure of the Chinese garlic industry and the understanding that non-garlic inputs can have an effect on garlic production . . . the reported upstream inputs used to produce the raw garlic bulb are not entirely accurate and do not account for off-season factors;" (8) that, regarding land use, "the record shows that Yongjia cannot accurately report the precise land area under cultivation for its leased farm;" and, finally, (9) that "Yongjia's argument that the cotton grown in the off-season is a special kind of cotton which is resistant to pests and requires no pesticide" should be disregarded based on a lack of "record evidence concerning the type of cotton grown in the off-season, or whether this cotton is resistant to pests." Issues & Dec. Mem. at Comm. 2.

     In making its claim that Commerce should have used its standard FOP methodology to construct normal value, Yongjia takes issue with three of the Department's findings.  First, in response to Commerce's finding that there were major discrepancies between the farm labor reported and that observed during verification, Yongjia maintains that the discrepancy resulted from a misunderstanding of the facts.  Pls.' Reply. Br. Supp. Mot. J. Agency R. ("Pls.' Reply Br.") 11.  "When

harvesting, farmers usually put out newly harvested wet garlic for four to five days for air dry.  However, during verification, farmers had no time to dry the wet garlic, so they used wet garlic, which was more difficult to handle with and took longer time in later steps: trimming the roots and cutting the stems." Pls.' Reply Br. 11.  Although this argument seems addressed at Commerce's statement that Yongjia failed to keep accurate records of labor used to grow its garlic, it does not appear to seriously call into question the Department's findings.  Rather, Yongjia's statement tends to confirm that the Department was unable to verify Yongjia's reported labor FOP for growing the garlic.

With regard to Commerce's finding that Yongjia did not accurately calculate harvesting and cold storage yield loss, plaintiffs state that Commerce's request "to provide yield loss calculation from the point harvesting the garlic which is covered with water and mud . . . is not reasonable."  Pls.' Reply Br. 11. Instead, "Yongjia reported its yield loss starting from total gross dry garlic minus garlic set aside for seed as denominator." Pls.' Reply Br. 11-12.  Again, Yongjia does not directly address Commerce's finding regarding yield loss due to shrinkage during production.  Instead, Yongjia urges the Department to start its analysis after the garlic was already dry.

Commerce's findings, however, were directed at what took place prior to the point at which the garlic was dry.  For

instance, Commerce found during verification that the total harvest reported did not include "[g]arlic which is too small or damaged that is given to the workers to take home[,] [t]he approximate percentage of water weight the garlic loses from the time it is dug from the fields to the time it is first weighed, [or] [d]iscolored garlic which is thrown away."  Admin. R. ("AR") Doc. No. 167 at 17-18.  Commerce also found that Yongjia underrreported its "total harvest, the starting point for its yield loss calculation and the denominator for its farming factors of production."  *Id*. at 18.  By not directly addressing these findings, Yongjia tacitly confirms them.

Finally, the company argues that Commerce's statement that Yongjia estimated "electricity consumption for cold storage of garlic" is not accurate.  Yongjia claims that it knew that each bag used for cold harvest weighed forty four kilograms per bag, and that it used the number of bags times forty four kilograms to find the cold storage weight used to calculate electricity consumption.  Pls.' Reply Br. 12.  Thus, for Yongjia, its calculation was not an estimate, and should have been accepted as a replacement for metered electricity.  It is difficult to see, however, how Yongjia's proposed calculation would be a good substitute for metered electricty.

As discussed *supra*, Commerce identified a number of Yongjia's upstream FOPs that it determined could not be used in

its normal FOP methodology.  The company was given an opportunity to address the identified problems with its reported FOPs on several occasions and failed to do so to Commerce's satisfaction. *See*, *e.g.,* AR Doc. No. 182.  As has been seen, Yongjia has continued to fail to directly address Commerce's findings before the court.  Based on the material found in the Issues and Decision Memorandum, and Yongjia's apparent inability to produce evidence calling Commerce's findings into question, the court concludes that Yongjia's reported upstream FOPs do not provide the basis for calculating normal value.  *See* Final Results, 73 Fed. Reg. at 56,552 (Commerce's reliance on Yongjia's reported FOPs "would lead to an inaccurate result because the Department would not be able to account for a significant element of cost . . . .").

Based on the foregoing discussion, the court holds that Yongjia's contention that Commerce exceeded its discretion by not using its reported upstream FOPs is without merit.[11]

---

[11]     While the court does not have before it the question whether the intermediate input methodology conforms to the statute, it is worth noting that the cases Commerce cites do not necessarily support its use.  For instance, the Department relies on *Shakeproof Indus. Assembly Components. of Illinois Tool Works Inc. v. United States,* 268 F.3d 1376 (Fed. Cir. 2001) ("*Shakeproof*").  In that case, the Federal Circuit was presented with the question of whether it was legally permissible for Commerce to value factors of production using market prices when constructing normal value.  *Id*. at 1381-82.  In other words, the question was not whether Commerce was required to use the four factors of production set out in 19 U.S.C. § 1766b(c)(3), but,
                                                  (continued...)

II.  Surrogate Values of Garlic Bulbs

Yongjia, QTF and Golden Bird each challenge Commerce's

selection of the APMC Bulletin data as the surrogate value for

whole garlic bulbs.  Pls.' Br. 2.  Pursuant to statute, the

information used by Commerce to value FOPs is to be the "best

available information regarding the values of such factors [of

---

[11](...continued)
rather, how to place a price on them.  In reaching its conclusion
that using market prices was a permissible interpretation of the
statute, the Court relied on the language of 19 U.S.C.
§ 1677b(c)(4), which directs Commerce to value factors of
production using surrogate prices "to the extent possible."
Thus, the Court found that where it was not possible to derive
the "best possible information" from surrogate values, market
values (which were the best possible information) could be used.
*Id*.  Thus, the case stands for the proposition that Commerce may
use market *prices* to value FOPs, but does not hold that it may
ignore the direction in 19 U.S.C. § 1677b(c)(3) to use specific
FOPs in its methodology.

Commerce also cites *Lasko Metal Products, Inc. v. United
States*, 43 F.3d 1442 (Fed. Cir. 1994).  There, Commerce valued
some factors of production using surrogate values, and some using
the values from market purchases made by the exporter.  The Court
affirmed the use of this "mix and match" methodology, stating
that, "[i]n this case, the best available information on what the
supplies used by the Chinese manufacturers would *cost* in a market
economy was the price charged for these prices on the
international market."  *Id*. at 1446 (emphasis added).  As a
result, both cases stand solely for the proposition that when
valuing factors of production, i.e., placing a price on them,
Commerce may use market value prices that represent the "best
available information."

Commerce's intermediate input methodology, however, may not
take advantage of the "to the extent possible" language found in
§ 1677b(c)(4) because that phrase is restricted to the "prices or
costs" of factors of production, and not to the factors
themselves.  Nor may Commerce rely on the "best available
information" language cited by the Federal Circuit in *Shakeproof*
as this language also relates solely to valuation.

production] in a market economy country or countries considered to be appropriate."  19 U.S.C. § 1677b(c)(1).  Commerce's practice, in selecting the best available information for valuing FOPs, is to select "surrogate values which are product-specific, representative of a broad market average, publicly available, contemporaneous with the POR and exclusive of taxes and duties." Issues & Dec. Mem. at Comm. 4.  This practice has found approval in this Court.  *See, e.g., Allied Pacific Food (Dalian) Co. Ltd. v. U.S.*, 34 CIT __, __, 716 F. Supp. 2d 1339, 1343 (2010).  As has been noted, Commerce decided to use the surrogate value for whole garlic bulbs from India: (1) as a raw material in its standard FOP methodology to construct normal value for QTF and Golden Bird; and (2) as the starting point to calculate normal value for Yongjia using the intermediate input methodology.  No party disputes Commerce's choice of India as the surrogate country.

The APMC Bulletin price data chosen by the Department as the data source for whole garlic bulbs was submitted by defendant-intervenors.  AR Doc. No. 116, Ex. 2.  Commerce chose to use this source, even though plaintiffs placed two other possible data sources on the record: (1) the World Trade Atlas ("WTA") data; and (2) data from AGMARKNET, an online database maintained by the Indian Ministry of Agriculture.  Plaintiffs also put the Azadpur APMC data found *online* on the record in order to demonstrate the

claimed unreliability of the APMC Bulletin data.  AR Doc. No. 103 at 3-5.

In reaching its decision to value whole garlic bulbs using the prices reported in the APMC Bulletin, Commerce found that the data was the best available because: (1) it was publicly available as a result of being posted at the APMC facilities for public viewing, could be obtained in pamphlet form at the APMC facilities, and is electronically archived and accessible on request; (2) it was product specific, in that it was the only data on the record that included information on grades of garlic, which are size dependant, a factor that, according to Commerce, plays heavily in the valuation of garlic bulbs; (3) it represented a broad market average as a result of APMC being "the largest fruit and vegetable market in Asia [that] has become a 'National Distribution Centre' for important Indian agricultural products, such as garlic;" and (4) it was from a source that contained information for each day on which the Super-A bulbs were traded during the POR, and, therefore, was contemporaneous with the POR.  Issues & Dec. Mem. at Comm. 4 (internal citations omitted).

Plaintiffs argue that, during the administrative proceedings, they "disagreed with Commerce's use of Azadpur APMC Bulletin data because (a) it is not publicly available

information;[12] (b) it is not product specific, as size-specific criterion distorts product-specific requirement by Commerce's practice; and (c) the values of [the Super-A bulbs were] not contemporaneous with the POR."  Pls.' Br. 4.

    A.    Public Availability of Azadpur APMC Bulletin Data

    In making their arguments with respect to public availability, plaintiffs first submit that the APMC Bulletin data is not the same as that which can be downloaded from the official APMC website.  Pls.' Br. 7.  Plaintiffs then assert that because it differs from that on the APMC website, the APMC Bulletin data is not publically available.  Pls.' Br. 7-8.

    It is apparent that plaintiffs' claim is without merit. First, the APMC website does not purport to contain all of the APMC Bulletin data; rather, it provides a summary of the APMC Bulletin data.  AR Doc. No. 158 ("the Azadpur APMC website (www.apmcazadpurdelhi.com) provides summary information on garlic arrival quantity, maximum price, modal price and minimum price

---

    [12]    When Commerce has determined that it must use a surrogate value for calculating normal value, it will "normally use publicly available information" for valuation purposes.  19 C.F.R. § 351.408(c)(1) (2009).  "Publicly available" is not defined by statute or regulation.  Further, the word "normally" indicates that Commerce is well within its bounds to use non-public information if it determines that it is the best information available. *Dorbest Ltd. v. United States,* 30 CIT 1671, 1678, 462 F. Supp. 2d 1262, 1270 (2006) (stating that "use of the word 'normally' means that Commerce may select other data as warranted under the circumstances").

but as yet does not provide grade-wise information."). This is apparently why plaintiffs were unable to find some of the information found in the APMC Bulletins online, particularly information relating to garlic grades. Pls.' Br. 7 ("On Azadpur APMC official website, there is no report of garlic grading as grade A, B C [sic] or [Super-A]."). That all of the data found in the APMC Bulletins is not also found on the website, however, does not render the APMC Bulletins somehow unavailable to the public.

Next, plaintiffs claim that because the APMC Bulletins can only be obtained at the APMC market, they are necessarily not publically available. According to the Chinese companies, because the data cannot be downloaded from the internet, it is unavailable to the public. Pls.' Br. 8. As defendant points out, however, "court documents generally are considered to be publicly available if one can go to the courthouse to request the documents." Def.'s Mem. 24. For the Department, because the APMC Bulletins could be obtained by anyone who went to the market and asked for them, and because the APMC Bulletin information was publicly posted and maintained on the APMC database in electronic form, it was publicly available. Issues & Dec. Mem. at Comm. 4.

In addition, according to the Department, the APMC Bulletins were public even if not available on the internet in their entirety. That is, Commerce determined that the full APMC

Bulletin data was publicly available because, while it "is not readily available on the internet, it is readily available to its intended public audience, wholesalers and buyers at Azadpur APMC in India." Issues & Dec. Mem. at Comm. 4. Moreover, Commerce states that it has electronic versions of each daily bulletin for the POR; a full six months of data, on which it based its surrogate values. *Id*.

The APMC Bulletin documents are clearly public as that word is normally understood. That is, they are available to anyone who goes to the market and asks for them. Plaintiffs fail to explain why the APMC Bulletins are not publicly available merely because they are not on the internet. As a result, plaintiffs' argument that the APMC Bulletin data was non-public is unconvincing.

Next, plaintiffs take issue with the identities of the consultants defendant-intervenors hired to author the Market Research Report.[13] *See* Pls.' Br. 8-9. The companies argue that because the names of the consultants were never disclosed to plaintiffs, the data in the Market Research Report is

---

[13] The Market Research Report was prepared by defendant-intervenors to support the use of the APMC Bulletin data as the surrogate value data. The only information to which plaintiffs' counsel did not have access in the Market Research Report was the name of the expert hired by defendant-intervenors to prepare the report, and the names and titles of certain persons who provided information, but the name of the company hired, as well as all of the actual information used in preparing the report, was not treated as privileged. Issues & Dec. Mem. at Comm. 4.

unverifiable.  *See* Pls.' Br. 8-9.  According to plaintiffs, there was no way to "figure out the existence of such a database ready for pick-up by physically visiting Azadpur APMC market," except by being told so by defendant-intervenors' consultants.  Pls.' Br. 8.

In the Issues and Decision Memorandum, Commerce concluded that because "the report does identify the organization that each of the sources represents, and all other information in the report is public[,]" the confidentiality granted to the identities of the independent consultants had no bearing on the verifiability of the APMC Bulletin data.  Issues & Dec. Mem. at Comm. 4.  In other words, Commerce's decision to keep the names of the defendant-intervenors' consultants confidential did not prevent plaintiffs from challenging the accuracy or reliability of the APMC Bulletin data, because the sources of the data were clearly stated.  Thus, had plaintiffs wished to find out for themselves if the APMC Bulletins were publically available and contained the information Commerce found therein, they could have done so, whether defendant-intervenors' consultants were known to them or not.  Therefore, plaintiffs' argument cannot be credited.

Finally, plaintiffs contend that the AGMARKNET data is more public than the APMC Bulletin data because it is "[a]n internet-based market information system . . . sponsored by Indian Agricultural Marketing Information System under the Department of

Agriculture & Cooperation, Ministry of Agriculture . . . .
Furthermore, people get access to the information through the
internet; it bypasses middlemen, which is different from
government related APMC." Pls.' Br. 9. Regardless of whether
the AGMARKNET data is more easily accessible, for the reasons
previously noted, Commerce's determination that the APMC data is
publicly available remains valid. The Department's longstanding
preference is for "publicly available information," not
necessarily the most publicly available information. Under the
facts of this case, there is nothing to indicate that the APMC
Bulletins were not publically available. 19 C.F.R.
§ 351.408(c)(1) (2009).

### B.    Product Specificity of APMC Bulletin Data

Plaintiffs also challenge the APMC Bulletin data on the
grounds that it was not product specific. Pls.' Br. 3. The
Chinese companies argue that, in order to make its analysis
product specific, Commerce should have looked at the local
factors in India and China, including the natural endowments of
the land, climate, labor skills, traditions and experiences,
while conducting its FOP analysis. Pls.' Br. 10-11 ("As the
Department decides India as the surrogate country in this review,
it is necessary to compare the garlic production and local
producer prices in the two countries."). In other words,

plaintiffs maintain that, while the size of the garlic bulb was a relevant factor in selecting the surrogate value, Commerce failed to take into account the numerous differences between growing and harvesting the garlic in India and in China.  In addition, the Chinese companies contend that Commerce should have considered that China produces more garlic at cheaper prices than India. Pls.' Br. 11 ("According to the statistics from the Food and Agriculture Organization, China, as compared to India, has much higher garlic production and lower prices.").

For its part, defendant insists that "[s]uch a comparison of the production experience of a non-market economy, such as China, and a market economy, such as India, is illogical.  The use of surrogate values recognizes that market principles apply differently in non-market economies."  Def.'s Mem. 25.  In a similar vein, defendant-intervenors contend that Commerce's "non-market economy methodology does not provide for the consideration of growing conditions in China, but rather requires normal value to be derived based on the value of the factors of production in a surrogate market economy country."  Def.-Ints.' Br. 17.

Plaintiffs' argument that the local factors of China and India should be compared in the surrogate value calculation is unconvincing.  The surrogate value statute is not intended to make adjustments for local factors in the NME country at issue.

On the contrary, the purpose of 19 U.S.C. § 1677b(c) is to avoid the potentially skewed local factors in a NME country by replacing them with suitable surrogates from a comparable market economy country. This is, of course, particularly true with respect to the price for which a product is sold in an NME country. *Rhodia, Inc. v. United States*, 25 CIT 1278, 1286, 185 F. Supp. 2d 1343, 1351 (2001) (citing *Nation Ford Chem. Co. v. United States*, 166 F.3d 1373, 1375 (Fed. Cir. 1999)) (finding that the purpose of the statute is "to construct the product's normal value as it would have been if the NME country were a market economy country"). Therefore, the court holds that Commerce was not required to consider the differences between China and India, as identified by plaintiffs, when determining the surrogate value of the whole garlic bulb.

Plaintiffs also take issue with Commerce's decision to use Super A grade garlic prices as surrogate values.[14] Pls.' Br. 11-12. The Department based its decision to use the values for Super A grade garlic bulbs, when constructing normal value, on its conclusion that all plaintiffs "reported garlic bulb size in excess of 55 mm, and because bulb sizes that are 55 mm and above are typically classified as [Super A] grade garlic." Issues &

---

[14]    In previous reviews, Commerce has determined that the price at which garlic is sold is heavily dependant on physical characteristics such as bulb size. Preliminary Results, 73 Fed. Reg. at 24,046.

Dec. Mem. at Comm. 4.  Put another way, Commerce used the Super A grade garlic prices, which covered bulbs larger than fifty five millimeters in diameter, because plaintiffs reported sales of bulbs of fifty five millimeters and larger in their questionnaire responses.  The APMC Bulletins reported price data for each grade based on size.

Plaintiffs assert that Commerce's decision was not supported by substantial evidence.  Pls.' Br. 12 ("Besides the inference from the statements by unidentified consultants hired by the Petitioners, Commerce did not obtain any substantial evidence to support its using the values of [Super A] garlic, as its size is above 55 mm according to Commerce, to calculate the surrogate value for the Respondents.").  Plaintiffs, however, fail to point to any evidence tending to support a conclusion that some other type or grade of garlic bulb should have been used.  Rather, they argue solely that Commerce's conclusion to use the Super A grade garlic bulb must have been based on statements made by defendant-intervenors' consultants, and, therefore, was not supported by substantial evidence.  Pls.' Br. 12.

Clearly that is not the case.  There is no dispute that all of plaintiffs' reported sales were of bulbs fifty five millimeters or larger, and that the price of garlic is based on size.  Issues & Dec. Mem. at Comm. 4.  Bulbs of this size were recorded in the APMC Bulletins as having been graded and sold as

Super A grade garlic.  The court, therefore, holds that
Commerce's use of Super A grade garlic values was supported by
substantial evidence.


    C.    Contemporaneity of Azadpur APMC Super A Grade Garlic
          Data

    Plaintiffs next argue that, because the APMC Bulletin data
for Super A grade garlic lacks entries for the period between
March 22, 2007 and April 30, 2007, it is not contemporaneous with
the POR, and, therefore, is unsuitable as surrogate data.  Pls.'
Br. 13.  Commerce, however, had APMC Bulletins for the days with
which plaintiffs take issue, and found that there were no sales
of Super A grade garlic on those days.  Issues & Dec. Mem. at
Comm. 4 ("Moreover, the Department has reviewed the Bulletin
price data and is satisfied that each day where data could have
been available at the APMC, that data was submitted.").
Plaintiffs insist that, because Commerce did not seek further
evidence to prove that no transactions occurred during that
period, its decision to use the APMC Bulletin data was "lacking
substantial evidence."  Pls.' Br. 14.  Plaintiffs, thus, argue
that the APMC data is incomplete, and, therefore, not
contemporaneous with the POR.  Pls.' Br. 13.  As an alternative
to the Super A grade garlic data, plaintiffs contend that
Commerce should have used other information on the record, such
as the A grade garlic data, as there were transactions for the A

grade garlic on the missing days.  Pls.' Reply Br. 5.

The Department states that it had every APMC bulletin for the POR on the record, and determined that, for the period of March 22, 2007 through April 30, 2007, there were no transactions for Super A grade garlic.  Issues & Dec. Mem. at Comm. 4 n.44. Plaintiffs failed to put any evidence on the record challenging this conclusion.  Instead, they assert that "the missing information is extremely unfavorable to the [plaintiffs]."  Pls.' Br. 14.  As a result, it is clear that the Department had on the record all of the Super A sales made during the POR.

As to plaintiffs' argument that Commerce should have used values for A grade garlic in addition to the values for Super A grade garlic in its calculations, the Department considered this possibility and rejected it.  Issues & Dec. Mem. at Comm. 4. Commerce concluded that there was no justification for using A grade garlic prices because A grade bulbs are of a smaller average diameter than Super A grade bulbs, and, therefore, less similar to the garlic bulbs plaintiffs exported, which were all larger than A grade.  *Id*.  ("[B]ecause the Respondents have all reported sizes of 55 mm and above, and because bulb sizes that are 55 mm and above are typically classified as [Super A] grade garlic, we have continued to value the whole garlic bulb using [Super A] grade data from the *Bulletin*.") (emphasis in original). As a result, using the price values for A grade garlic would have

led to a less accurate result than using just Super A grade garlic.  Plaintiffs provided no compelling reason for including in the average a product that they did not actually sell. Because the Super A grade bulbs were more product specific and because Commerce had APMC Bulletin data for each date that garlic bulbs similar to that exported by plaintiffs were actually sold, Commerce's decision to use the Super A grade garlic based on sales contemporaneous with the POR, is supported by substantial evidence and is sustained.

 

D.   Broad Market Average of Super A Grade Garlic Values

Plaintiffs also challenge Commerce's determination that the APMC data represents a broad market average.  Pls.' Br. 14.  In making their argument, the Chinese companies correctly state that it is Commerce's practice to use country-wide data instead of regional data when the former is available.  Pls.' Br. 14; Issues & Dec. Mem. at Comm. 4.  In support of this argument plaintiffs note that the Azadpur APMC is one of 7,000 APMCs throughout India and that the Azadpur APMC garlic transactions accounted for 5.583 percent of all garlic transactions across India in 2006.  Pls.' Br. 14-15.

Commerce, however, found that the APMC Bulletin data was country-wide and "a reliable and credible representation of a

broad market representation."[15]  Issues & Dec. Mem. at Comm. 4

("A careful examination of the Bulletin shows that agricultural

products from all over India are sold at Azadpur APMC. . . .  In

addition, we note that the data set used by the Department to

calculate the garlic bulb surrogate value for [Super A] grade

garlic represents over 11 million kilograms of garlic sold from

six Indian states.").  In other words, Commerce found that, based

on the size and scope of the Azadpur APMC and the volume of goods

traded at the market, the APMC Bulletin data met Commerce's

preferred criteria for surrogate values.

The Department has sufficiently demonstrated that the APMC

data set does in fact represent a broad market average, as it is

from a large agricultural market in India and is for a

substantial portion of the garlic market in that country.  The

evidence plaintiffs placed on the record is insufficient to call

into question any of Commerce's findings regarding whether the

APMC Bulletin data represents a broad market average.  In sum,

Commerce's decision to use the APMC Bulletin data as a broad

market average is supported by substantial record evidence.

---

[15]    In order to meet its own preference for a country-wide
data set, Commerce chose to use data for grade Super A garlic
produced in six different Indian states sold at the Azadpur APMC,
and not data from a single state as had been done in previous
reviews.  Issues & Dec. Mem. at Comm. 4 n.43.

E.    Commerce's Determination That the AGMARKNET Data did
      not Constitute the "Best Available Information"

During the administrative proceedings, plaintiffs urged Commerce to select either the WTA data or the AGMARKNET data. Before the court, plaintiffs have made no argument for the WTA data, and insist that the information on the AGMARKNET website should be used. Commerce considered the AGMARKNET data offered by plaintiffs, but found that the "four-page descriptive brochure and a sample page from [AGMARKNET]'s website showing garlic prices for one day" did not constitute the best available evidence. Def.'s Mem. 23. An examination of the AGMARKNET data reveals that it does not have information relating to garlic by grade.

Commerce's decision not to use the AGMARKNET data is sustained. This is because one day of the ungraded AGMARKNET sales did not satisfy the Department's preference for product specific data that is contemporaneous with the POR. Thus, it is apparent that Commerce, as required by statute, considered the AGMARKNET data, and was reasonable in concluding that it did not constitute the "best available information." *See* 19 U.S.C. § 1677b(c)(1).

III. Plaintiffs' Evidence Concerning Effect of Flooding on Garlic
     Prices in India

Finally, plaintiffs assert that Commerce failed to take into account a rise in garlic prices in India during the POR, resulting from the disruption of the growing season by flooding. Pls.' Br. 17.  Although plaintiffs assert that the flooding caused an abnormal increase in garlic prices during the POR, the sole evidence they placed on the record is a newspaper article speculating on the possible effect of local flooding on garlic prices.  AR Doc. No. 103, Ex. 10 ("Retail prices of garlic *may* double by December because of low production and wastage due to floods.") (emphasis added).

This article does not constitute any evidence that flooding did, in fact, affect prices or to what degree prices were affected.  Plaintiffs could have timely placed factual information of flooding on the record in the administrative proceedings before Commerce, but failed to do so.  As such, the Department correctly concluded that it had no information from which to draw a conclusion, one way or another, about the effect of flooding on the price of garlic when determining the surrogate price for the whole garlic bulbs.

CONCLUSION

Based on the foregoing, the court denies plaintiffs' motion for judgment upon the agency record and sustains Commerce's final results.

                                          /s/ Richard K. Eaton
                                          Richard K. Eaton


Dated:      December 16, 2010
            New York, New York